No. 79,136

STATE OF KANSAS, *Appellee*, v. DANIEL ESQUIVEL-HERNANDEZ, *Appellant.*

(975 P.2d 254)

Opinion filed March 5, 1999.

*Michael K. Lehr*, of Wichita, argued the cause and was on the brief for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Charles R. Reimer*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his conviction of second-degree intentional murder, claiming the trial court erred in finding he had waived his rights under *Miranda* and in finding that his statements to police were not coerced in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Only facts relevant to the issues on appeal are discussed.

On October 26, 1996, on a street in Wichita, Kansas, there was a confrontation between two rival gangs. The victim, Juan Rivera, died at the scene. The defendant, Daniel Hernandez, age 20, sustained three gunshot wounds.

Hernandez was driven to the hospital by his friend, Jarod Haeri. As Haeri attempted to leave the hospital after dropping off Hernandez, a security guard at the hospital stopped Haeri's car and detained him until police arrived. Police officers took custody of Haeri's car and searched it for weapons. No weapon was found in the car.

In the hours following the shooting, police officers interviewed witnesses, including Jarod Haeri. Haeri identified Hernandez as the person who shot Rivera. Haeri told police that Hernandez had hidden the gun in the passenger side floor air vent of his (Haeri's) car.

Officers again searched the car, including the passenger side floor air vent of the car. Police found a black semi-automatic pistol in the air vent. Forensic analysis later confirmed that the gun had fired the shots which killed Juan Rivera. Hernandez then became the primary suspect in the police investigation.

Hernandez is a native of Mexico, and his first language is Spanish. At the motion to suppress, Detective Robert Chisolm testified that he first interviewed Hernandez in the hospital surgical intensive care unit (SICU) on October 28, 1996, 2 days after the shooting. Officer Bernie Jacobs was also in the room. When interviewed, Hernandez was sitting in a chair, and he had access to a morphine pump which enabled him to self-administer controlled doses of morphine. The officers introduced themselves to Hernandez and indicated they wanted to interview him regarding his involvement in the shooting of Juan Rivera. Hernandez responded in English that he understood the officers.

The interview was recorded on audiotape. Before turning on the recorder, the officers read Hernandez his *Miranda* rights. Hernandez indicated that although he could not read English, he understood each right as it was read to him by the officers from the *Miranda* rights card. The officers did not ask Hernandez to sign

or initial a form to acknowledge he understood and waived his rights.

The officers asked Hernandez basic personal history questions before beginning questioning on the crime. Hernandez did not ask for an interpreter. Hernandez answered the questions appropriately in English. The officers observed Hernandez for signs of altered mental state and concluded that Hernandez was aware and exhibited no abnormal or bizarre behavior.

The officers then used a tape recorder to record the interview. Neither the tapes nor the transcript of the tapes are included in the record on appeal. Nine minutes into the interview, Hernandez began to have difficulty answering the questions. He utilized the medication pump to self-administer doses of morphine. The officers asked Hernandez if he wished to continue the interview after a short break. Hernandez indicated he did. After a 10-minute break, the officers returned and concluded the interview in 5 minutes.

In the interview, Hernandez asserted that he did not have a handgun and he did not observe anyone else with a handgun at the crime scene. Hernandez stated that he had been standing in the street when he heard gun shots and was struck by bullets. Hernandez acknowledged that he formerly belonged to a gang, but stated that he was not at that time an active gang member.

The following day, October 29, 1996, Detectives Chisolm and Relph returned to the hospital room for a second interview. Hernandez had been moved from SICU to a private room. During the second interview, Hernandez was sitting up in bed and had a pump for intravenous self-administration of morphine. After short introductions, Hernandez indicated his willingness to submit to a second interview. The officers turned on the tape recorder.

The record indicates that the tape of the second interview contained the reading of *Miranda* rights to Hernandez and Hernandez' waiver of those rights. The second interview was in English by Detective Chisolm. Hernandez responded coherently and appropriately to the officer's questions. Most of the answers given by Hernandez were one word responses. The second interview lasted for 20 minutes. Hernandez did not request a break. The officers

testified at the suppression hearing that Hernandez did not exhibit any bizarre or abnormal behavior during the second interview.

Hernandez stated in the second interview that he had been standing next to someone in the street who started shooting a gun. When Hernandez attempted to grab the gun, he was shot. After being shot, Hernandez fired at the unknown person who had shot him.

Prior to trial, Hernandez moved to suppress the statements he made to the police during the two hospital interviews. The motion alleged that Hernandez did not freely, knowingly, or voluntarily waive his *Miranda* rights during the hospital interviews due to his limited competence in English and his drug-altered mental state, *i.e.*, the effects of morphine. He also denied any responsibility for the shooting death of Juan Rivera.

At the suppression hearing Hernandez testified through an interpreter. After hearing the evidence and reviewing Hernandez' taped hospital statements, the district judge found that Hernandez had knowingly waived his rights and denied the motion to suppress.

Over defense objection, the taped interviews were admitted into evidence during the trial and played for the jury. The jury found Hernandez guilty of intentional second-degree murder. Hernandez was sentenced to life imprisonment with a mandatory term of confinement of 10 years. Hernandez appeals pursuant to K.S.A. 22-3601(b)(1).

## WAIVER OF RIGHTS

Hernandez asserts that his limited understanding of the English language and his injured and medicated condition affected his ability to knowingly waive his rights. Hernandez contends that under these circumstances his statements during the hospital interviews were inadmissible because he did not voluntarily, knowingly, and understandingly waive his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). The State argues that Hernandez' waiver of his rights was voluntary, knowing, and understanding. The State also contends that even if the statements made by Hernandez in the hospital interviews were

erroneously admitted at trial, the error was harmless because the State's case was overwhelming against the defendant.

The State's contention that the error could be harmless is incorrect. The Supreme Court has held that any criminal trial use against a defendant of his involuntary statement is a denial of due process of law, " 'even though there is ample evidence aside from the confession to support the conviction.' " *Mincey v. Arizona*, 437 U.S. 385, 398, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978) (quoting *Jackson v. Denno*, 378 U.S. 368, 376, 12 L. Ed. 2d 908, 84 S. Ct. 1774 [1964]).

Waiver of *Miranda* rights must be knowing, voluntary, and intelligent under the totality of the circumstances. The burden of proving a voluntary waiver of rights is on the State. *Miranda*, 384 U.S. at 475. Therefore, if Hernandez' waiver of *Miranda* rights was not voluntarily, knowingly, and intelligently made, his conviction cannot stand and he should be granted a new trial.

First, although there was no documentation of Hernandez' express waiver of rights in the first hospital interview, it should be noted that Hernandez does not argue that the interviewing officers failed to provide him with *Miranda* warnings. His contention to suppress the statements goes solely to the voluntariness and his understanding of an express waiver.

As a general rule, uncoerced statements made to police officers by a defendant who has been given warnings as to his or her constitutional rights are admissible as evidence at his trial. *State v. Payton*, 229 Kan. 106, 109-10, 622 P.2d 651 (1981). The voluntariness of an accused's statement is viewed in light of the totality of circumstances, including the following factors: (1) the duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect, and background; and (4) the fairness of the officers in conducting the interrogation. *State v. Lumbrera*, 257 Kan. 144, 161, 891 P.2d 1096 (1995). Essential to the inquiry is the determination that the statement was the product of the free and independent will of the accused. *State v. Lane*, 262 Kan. 373, Syl. ¶ 5, 940 P.2d 422 (1997).

Hernandez relies on *Mincey v. Arizona*, to support his position that the circumstances attending his waiver of rights preclude a finding that he knowingly waived his rights under *Miranda*. The defendant in *Mincey* was seriously wounded a few hours prior to the police interrogation. Mincey had arrived at the hospital " 'depressed almost to the point of coma,' " according to his attending physician. 437 U.S. at 398. Mincey was in the intensive care unit of the hospital, lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus when the police arrived to question him. Mincey complained to the officer that his pain was "unbearable." 437 U.S. at 399. He was confused and unable to think clearly about the crime or the interrogation. Mincey responded to the officers' questions by writing his answers on pieces of paper. Many of Mincey's written answers were incoherent and obviously confused. 437 U.S. at 398-99. Mincey continually informed the interviewing officers that he was in no condition for questioning because he was confused or unable to think clearly, and he asked the officers to return the following day for an interview. 437 U.S. at 400-01. Mincey also requested legal counsel on several occasions during the interview. The officers ignored all of Mincey's requests. The interrogation lasted from 8 in the evening until almost midnight.

The Supreme Court found that Mincey was weakened by pain and shock, isolated from family, friends, and legal counsel; he was barely conscious; and his will was simply overborne. 437 U. S. at 401-02. The Supreme Court held that due process of law required that the statements could not be used at Mincey's trial. 437 U.S. at 402.

Hernandez' assertion that he was in the same position as Mincey is untenable.

If there is substantial competent evidence to support the trial court's findings that the defendant voluntarily, knowingly, and intelligently waived his rights, such findings will not be disturbed on appellate review. *State v. Salcido-Corral*, 262 Kan. 392, 405-06, 940 P.2d 11 (1997). The district court, after considering the testimony at the suppression hearing, the tape recordings of the hospital interviews, and the legal arguments of counsel, stated:

"I have listened to the tapes, reviewed all of the evidence, reviewed the law as I believe applies to the case and it seems to me the physical discomfort, the in-hospital situation, the fact that Mr. Hernandez was on an analgesic at the time and his language being primary [*sic*] Spanish are all to be considered, but they are to be set into the circumstances.

"Having heard the tape, I believe Mr. Hernandez is quite proficient in English and I also believe that he was in possession of all his faculties. All declarations that he made that are contained in the statements given by him [were] freely, voluntarily, knowingly made, I believe."

Hernandez states that the taped interview does not support the trial court's determination that he is proficient in the English language. He asserts that his responses were primarily one word affirmative and negative answers which do not indicate an understanding of the questions asked.

This court is unable to evaluate Hernandez' assertions regarding his taped responses because he has failed to provide in the record on appeal the tapes or the transcript of the tapes. An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, an appellate court presumes that the action of the trial court was proper. *State v. Moncla*, 262 Kan. 58, 68, 936 P.2d 727 (1997). Without the tapes or a transcript, this court must accept the trial court's evaluation of Hernandez' English proficiency.

Regarding the effect of Hernandez' physical discomfort and the administration of pain medication, the evidence is that the interviewing officers assessed Hernandez' mental functioning prior to initiating the interviews. They asked him general personal history questions, to which he responded appropriately, and they monitored Hernandez' demeanor and responses for continued competency. When Hernandez appeared to have difficulty during the interview due to pain, the officers suggested a break from the questions.

Hernandez testified at the suppression hearing that the morphine clouded his ability to think and that he had little recollection of the statements he made during the interviews. However, neither the interviewing officers nor the court in listening to the interview tape detected any signs of incoherence, disorientation, or inconsistencies in Hernandez' responses to the questions.

Both hospital interviews were of short duration, the first lasting a total of 15 minutes, the second lasting 20 minutes. The officers were mindful of Hernandez' pain and suggested a break during the first interview when Hernandez appeared to need one. The interviews were conducted in a hospital room where nurses frequently entered to attend Hernandez. Hernandez was 20 years old and demonstrated competence to understand the questions of the officers. In sum, there is substantial competent evidence in the record to support the trial court's finding that Hernandez voluntarily, knowingly, and understandingly waived his *Miranda* rights prior to making statements to the interviewing officers.

## COERCION

Hernandez contends that his statements in the hospital interviews were coerced; therefore, his conviction cannot stand. An analysis of the facts and conclusions shows that Hernandez' waiver of his right not to speak was voluntary. We note that if an accused was not deprived of his or her free choice to admit, deny, or refuse to answer, any statements by the accused may be considered voluntary. *State v. Prince*, 227 Kan. 137, 144, 605 P.2d 563 (1980). The statements made by Hernandez during the interviews were not coerced and were admissible as evidence.

Affirmed.