No. 78,476

STATE OF KANSAS, *Appellee*, v. SCOTT MCCORKENDALE, *Appellant*.

(979 P.2d 1239)

 Opinion filed
May 4, 1999. 

*Mary Curtis*, assistant appellate defender, argued the cause, and *Hazel Haupt*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with her on the brief for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. To-masic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Scott McCorkendale was convicted and sentenced for the first-degree premeditated murder of 15-year-old Rogelio Herrera. On appeal, the defendant claims error in the admission of his statements to police because they were involuntary and admitted in violation of his *Miranda* rights. He further claims that the trial court's allowing the prosecutor to argue transferred intent as well as prosecutorial misconduct requires reversal. We conclude that no reversible error occurred and affirm.

Herrera died instantly of a single gunshot wound to the head. The defendant fired the shot with a German Mauser 7.65 mm. infantry rifle, circa World War II. The bullet entered the forehead of the victim and blew out the back of his head, scattering brain and skull fragments in a 60- to 70-foot radius.

The defendant was 31 years old and worked in Kansas City, Kansas, building fuel trucks for airports. At the time of the shooting, he was living in Kansas City with his common-law wife, Melody Bulgarelli. He had previously lived in the neighborhood in Kansas City where the victim was killed. When the shooting occurred he was visiting his lifelong friend, David Crisp, who also lived in that neighborhood.

The night before the shooting, the defendant and Bulgarelli began drinking beer and continued throughout most of that night and into the next day. The defendant testified that he was very drunk on May 4, 1996, the day of the shooting. The defendant and Bulgarelli were driving to Crisp's house when they encountered a group of 8 to 12 teenagers in the neighborhood. The defendant did not like the looks he was getting from the group and he stopped, got out of his truck, and asked the teenagers what they

were looking at. Verbal assaults from the teenagers followed, and the teenagers approached the defendant's truck, throwing rocks and bottles. An object was thrown through the defendant's back window and Bulgarelli was cut by glass. The defendant and Bulgarelli then drove to his mother's house.

In a statement to the police following the shooting, the defendant's mother stated that the defendant was in a rage when he entered her home, demanded a gun, and in response to his mother's suggestion that he should report the incident to the police, stated to her that the police would do nothing about it. His mother indicated in her statement that the defendant went upstairs looking for a gun or ammunition and pounded the wall in frustration when he was not successful because he "was going to get even" with the teenagers. The defendant's mother told police that she demanded that her son leave her house, which he did. The defendant's mother's statement was admitted at trial because in her trial testimony she had no recollection of what transpired because of medication she was taking at the time of trial.

The defendant owned a German Mauser 7.65 mm. rifle which had been given to him as a Christmas gift by his parents. Upon leaving his mother's house, he then traveled to a shop in Johnson County called the Bullet Hole where he tried to purchase ammunition for the rifle. The Bullet Hole did not carry this rare ammunition and sent him to C&R Specialty, another hunting supply shop in Johnson County. With the added help of Bulgarelli, he purchased a box of ammunition at a cost of about $34. Employees from both shops remembered the defendant because of his unusual request. The defendant then traveled back to his home and retrieved the rifle.

The defendant and Bulgarelli went back to Crisp's house. The group of teenagers, including the victim, were still in the area. Both the defendant and Bulgarelli went into Crisp's house but the defendant came back out, set the rifle on the hood of a car in back of the house, and fired, shooting the 15-year-old victim in the head.

Several witnesses testified that they saw the defendant putting something behind the seat of his truck after the shooting. The six-year-old niece of a neighbor said that the defendant threatened her

uncle, Bruce Finger, after the shooting and told him not to tell anyone what he saw. Finger testified that defendant told him after the shooting: "I blew his fucking brains out."

Jason Wilt, a patrolman for the Kansas City, Kansas Police Department, was the first officer on the scene. He spoke to Jesse Dominquez, who told Officer Wilt that he had seen a person put something in a pickup truck right after the shooting. Later, he and Patrolman Jeffrey Miskec talked to the defendant. The defendant told them that he did not hear the gunshot and did not see anything.

Officer Wilt asked for and received permission from the defendant to search his vehicle. Patrolman Miskec searched the truck and found the Mauser rifle behind the seat. The defendant immediately raised his hands in the air and confirmed that the rifle was his. Officer Wilt told the defendant to put his hands down as he was not under arrest at the time.

Patrolman Miskec observed the defendant at the scene and testified that the defendant did not seem intoxicated and that his speech was coherent. Wilt testified that from the time the rifle was discovered, the defendant was not free to leave the area.

Lieutenant John Cosgrove of the Response Homicide Unit arrived at the crime scene and was informed that officers had located a truck parked in the alleyway with a rifle behind the seat. The defendant was sitting with Bulgarelli, Crisp, and Finger. Cosgrove asked the group about the rifle. The defendant said the rifle had been given to him by his father and that he had fired his rifle earlier that day at the Bullet Hole. Cosgrove asked the defendant to come down to the station.

Patrolman William Carpenter transported the defendant to the police station. He testified that the defendant did not seem to be intoxicated at the time. Lieutenant Cosgrove testified that he felt that while the defendant might be under the influence, he was able to walk without difficulty, answer questions, and did not slur his words.

After completing his crime scene investigation, Cosgrove went to the police station. The defendant was advised of his *Miranda* rights and indicated that he would give a statement. Cosgrove tes-

tified that during the questioning which was tape-recorded, the defendant responded to the questions and did not seem confused by any of them.

In his initial statement, the defendant told Cosgrove that following his purchase of ammunition, he went back to the Bullet Hole and test fired one shot on their shooting range. He stated that he was standing outside of Crisp's house when a gunshot sounded. He admitted going back to his apartment after the confrontation with the teenagers and getting his gun but stated that he only took the gun because he wanted to buy ammunition and test it.

At the end of the first statement, Cosgrove turned off the recorder and told the defendant that he knew long rifles could not be shot at the Bullet Hole. He stated to the defendant that a witness saw him with the rifle in back of Crisp's house and that they were going to do ballistics to find out who fired the rifle. He told the defendant that he did not think the defendant was a bad guy, and even though the defendant had told him the teenagers were unarmed and, thus, could not claim self-defense, he still felt the teenagers were somewhat culpable because they were "little thugs." Cosgrove then told the defendant that he did not think the defendant was a cold-blooded murderer, and stated a few times: "Are you sure you just didn't shoot down just to try to scare him, that you weren't trying to hit him, that maybe it was an accident?" The defendant responded, "Yeah, that's what happened."

Cosgrove then recorded the defendant's second statement in which the defendant stated that he "[w]ent over to the neighbor's fucking house in their drive-way slammed the barrel down on the fucking top of an Oldsmobile, pulled the fucken trigger to scare them, it hit somebody, shit fucken happens. I'm guilty, fuck it, let this." The defendant stated that he did not intend to strike Herrera and was not aiming the weapon. He said that he was a good shot and could take someone out if he wanted to but that was not the case in this situation. The defendant concluded by saying,

"No, and it's honest to the truth right there, I am not lying I'll get a fucking lie detector deal right now. I was not aiming, I just slammed the mother fucker down on the top of the Oldsmobile car next door to my little brother's house, and pulled the fucking trigger and it hit somebody, I was not aiming to hit anybody. I wanted

to scare them and it hit somebody so I'm going for murder. So let's just get this done and over with, I done admitted it."

The defendant then asked for his lawyer and questioning ceased. Additional facts bearing upon the defendant's claims are set out in this opinion.

## I. The Admission of the Defendant's Statements

Prior to trial, the defendant moved to suppress statements he made to the police. After a full hearing, the trial court denied the defendant's motion to suppress. On appeal, the defendant contends that his statements to police officers at the scene of the crime were made without a *Miranda* warning and, therefore, inadmissible; his crime scene statements tainted those statements made after he received a *Miranda* warning; and officers ignored his invocation of the right to remain silent made during the interrogation. Finally, he contends that all of his statements were involuntary, primarily based upon his intoxicated condition and, therefore, inadmissible under the Fifth Amendment to the United States Constitution.

### (a) Pre-*Miranda* Statements

The trial court noted that while the statements made between the time the defendant was actually in custody and the time he was given his *Miranda* warning might be subject to suppression, any such statements made by the defendant were not incriminating. See *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). We agree. Moreover, the record demonstrates that defendant's pre-*Miranda* statements were not introduced in evidence. The defendant admits that these statements were not admitted in the State's case in chief but contends that they were introduced by the State in rebuttal. Lieutenant Cosgrove was the State's only rebuttal witness and the record demonstrates that the defendant's pre-*Miranda* statements were not admitted. Even had they been admitted, we have held that *Miranda* does not preclude the use of such statements to impeach the defendant where such statements are inconsistent with the defendant's trial testimony bearing directly on the crime charged and the defendant makes no

claim that such statements were coerced and involuntary. See *State v. Graham*, 244 Kan. 194, 201, 768 P.2d 259 (1989).

(b) Post-*Miranda* Statements

The defendant further claims that his pre-*Miranda* statements made at the scene tainted the formal statement taken at the police station and should have been excluded because later statements were "fruit of the poisonous tree." It is difficult to follow the defendant's argument. His pre-*Miranda* statements were not incriminating. The formal statement taken at the station was not used by the State in its case in chief but instead was used in rebuttal after the defendant had testified for impeachment purposes. Thus, while the defendant was warned of his rights under *Miranda,* the formal statement was not subject to the requirements of *Miranda* because it was used in rebuttal only.

Even if we credit the defendant's argument about his earlier statements, such statements do not render his later formal statements inadmissible if they were, in fact, voluntary. See *Oregon v. Elstad,* 470 U.S. 298, 309, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985). In *Elstad,* the Supreme Court held that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." 470 U.S. at 309. *Elstad* applies in cases where there is no coercion or an attempt to undermine a suspect's ability to exercise free will. See *State v. Lewis,* 258 Kan. 24, 34-36, 899 P.2d 1027 (1995). Thus, the success of the defendant's entire argument rests upon his assertion that his statements were involuntary.

Factors to be considered in determining whether a confession is voluntary include: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect and background; and (5) the fairness of the officers in conducting the investigation. See *State v. Esquivel-Hernandez,* 266 Kan. 821, 975 P.2d 254 (1999); *State v. Speed,* 265 Kan. 26, 34-35, 961 P.2d 13 (1998). Voluntariness of a confession is determined from the totality of the circumstances, and where a

trial court conducts a full prehearing on the admissibility of extra-judicial statements by the accused, determines the statements were freely and voluntarily given, and admits the statements into evidence at trial, appellate courts accept that determination if supported by substantial competent evidence and do not attempt to reweigh the evidence. 265 Kan. at 35.

After a full hearing on the defendant's motion to suppress, the trial court determined that the statements of the defendant given to the police were freely and voluntarily given. Thus, this court reviews the following factors for substantial competent evidence only:

### 1. The accused's mental condition

The main question regarding the defendant's mental condition in this case is whether the defendant was intoxicated to the point that his statement was not voluntary. There was testimony that the defendant had consumed a large amount of beer on the day in question and, in fact, had consumed five beers between the time of the shooting and the interview. The defendant claimed that throughout the day he was "blurry." However, the various police officers that testified stated that the defendant was coherent, could understand and answer questions, and did not seem to be affected by intoxication. While Lieutenant Cosgrove did testify that he felt the defendant was somewhat under the influence at the crime scene, Cosgrove also testified that the defendant was coherent at the scene and responded appropriately and without slurring of speech. He also testified that the defendant understood his *Miranda* rights, agreed to give a statement, and was able to understand his questions and rationally respond to the questions asked.

### 2. The manner and duration of the interrogation

The defendant acknowledges that the interrogation was not extended. Further, there is nothing in the manner of the interrogation which would suggest that the defendant's statements were not voluntary.

### 3. The ability of the accused on request to communicate with the outside world

The defendant agrees that he made no attempt to communicate with the outside world or was refused permission to do so.

### 4. The accused's age, intellect, and background

Other than his argument concerning intoxication, nothing concerning the defendant's age, intellect, or background raises questions regarding the voluntariness of his statements.

### 5. The fairness of the officers in conducting the investigation

Lieutenant Cosgrove told the defendant that he knew long rifles could not be shot at the Bullet Hole, that a witness saw him with the rifle in the back of Crisp's house, and that they were going to do ballistics to find out who fired the rifle. He also told the defendant that he did not think the defendant was a bad guy and that even though the defendant had told him the teenagers were unarmed and, thus, could not claim self-defense, Cosgrove still felt the teenagers were somewhat culpable because they were "little thugs." Cosgrove told the defendant that he did not think the defendant was a cold-blooded murderer and stated a few times, "Are you sure you just didn't shoot down just to try to scare him, that you weren't trying to hit him, that maybe it was an accident?"

While the defendant claims that the above tactics were unfair and coercive, none of these statements require this court to conclude that the trial court's decision was not supported by substantial competent evidence. The question of whether coercive statements or other tactics render a confession involuntary depends upon whether the defendant's will was overborne at the time of confession. See *State v. Strauch*, 239 Kan. 203, 212, 718 P.2d 613 (1986). The trial court's conclusion that the defendant's statements were voluntary is amply supported in the record.

The defendant argues that in obtaining his formal statement at the police station, the officers disregarded his invocation of the right to remain silent. The following exchange between the officers and the defendant while being questioned at the station highlight defendant's claim.

"[Detective]: Ok, did Melody drive you out to the Bullet Hole?
"[Defendant]: Yes sir.
"[Detective]: And you went in and asked for.
"[Defendant]: Bought the shells. To the Bullet Hole [and] I asked them, they didn't have it they looked around, they said go to C&R, we went to C&R, we went back to the Bullet Hole, I fired one shot, put my gun on safety, put if (sic) behind the seat, drove to Dave's, shit happened and now I'm here. *So that's all I [got] to say.*
"[Detective]: Let me slow down just a minute. When you went to the Bullet Hole, do you have a card, that you're a member at the Bullet Hole?" (Emphasis added.)

The defendant argues that when he stated, "So that's all I [got] to say," he was invoking his right to remain silent and questioning should have ceased at that point. When a suspect makes a statement which may be ambiguous as to whether the suspect is asserting a right to remain silent, the interrogator may, but is not required to, ask questions to clarify and instead may continue questioning. *State v. Speed*, 265 Kan. at 37-38; *State v. Morris*, 255 Kan. 964, Syl. ¶ 4, 880 P.2d 1244 (1994). The defendant's statement that was all he had to say was not an unequivocal invocation of his right to remain silent. It could just have easily been interpreted as a statement that he had finished his explanation of the matter. At best, it was ambiguous. We conclude that the trial court did not err in failing to suppress the statements made by the defendant following this purported invocation.

## II. Transferred Intent

The defendant next contends that the trial court erred in allowing the State to argue the theory of transferred intent to the jury. He argues that there was no evidence that he intended to kill anyone but the victim and, therefore, no evidence supporting the doctrine of transferred intent.

At the conference on instructions, the State requested that the trial court give an instruction on transferred intent. The State did not identify the applicable Pattern Instruction for Kansas (PIK) nor set forth the text of the requested transferred intent instruction during the instructional conference. However, the trial court immediately recognized there was no evidence in the case supporting

such an instruction and denied the State's request. Argument about the merit of the instruction and the State's request that it be allowed to argue the contents of the instruction to the jury persisted for some five pages in the record. Ultimately, the court concluded that the State should be allowed to argue that the defendant would be guilty of first-degree premeditated murder whether the defendant meant to kill Herrera specifically, or simply meant to kill any of the teenagers in the group.

In its final argument to the jury, the State made the following argument:

"Trace the line of fire. Even if he was just shooting at the whole crowd of boys and not specifically Rogelio, if you believe that he intended to kill any one of those boys in [the] crowd, then under Kansas law you have to find him guilty of first degree [sic] for killing Rogelio. That's the doctrine of transferred intent, if you shoot at the crowd intending to kill any one of them, then that intent transfers over to the one that you did kill and you will see also in Instruction No. 6 that usually a person intends all the usual consequences of his voluntary acts."

PIK Crim. 3d 56.09 provides: "When a homicidal act is directed against one other than the person killed, the responsibility of the actor is exactly as it would have been had the act been completed against the intended victim." The trial court was correct in its conclusion that "[t]here is no evidence that he [the defendant] intended to shoot another particular person and missed that person and wound up hitting this person." Thus, the doctrine of transferred intent as set forth in PIK Crim. 3d 56.09 is not applicable to the facts in this case. See *State v. Garza,* 259 Kan. 826, 828-30, 916 P.2d 9 (1996).

The defendant argues that allowing the State to argue the doctrine of transferred intent in closing arguments when the doctrine did not apply was error. However, it is clear that the State in its final argument was not arguing the doctrine of transferred intent and did not clearly understand what that doctrine was. Instead, the State's argument was, "if you believe that [the defendant] intended to kill any one of those boys in [the] crowd, then under Kansas law you have to find him guilty of first degree for killing Rogelio." This is a correct statement of the law, for the defendant would, in fact, be guilty of first-degree murder whether he intended to kill Her-

rera specifically, or merely intended to kill any one of the teenagers in the group.

The instructions is this case were clear on premeditated murder as well as all lesser included charges. The jury was advised that statements of counsel were not evidence. We conclude that the mistaken use of the words "doctrine of transferred intent" in the State's final argument provides no basis for reversal of the defendant's conviction.

The defendant further argues that the State was essentially allowed to argue that second-degree unintentional murder, *i.e.* the firing of a gun into a crowd, would qualify as first-degree premeditated murder. However, it is clear that the State's argument to the jury was that even if the jury found that the defendant did not mean to kill Herrera but intended simply to kill any one of the boys in the group, it would qualify as premeditated first-degree murder. Contrary to the defendant's assertion, the State did not argue that the defendant could be convicted of first-degree premeditated murder if he merely fired a gun into a crowd without the intent to kill. Moreover, the trial court properly instructed the jury on second-degree unintentional murder in accord with K.S.A. 21-3402(b), which states that murder in the second degree is the killing of a human being committed unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life.

We have held that, in summing up a case, a prosecutor may draw reasonable inferences from the evidence and is allowed considerable latitude in discussing the evidence. *State v. Heath*, 264 Kan. 557, 583, 957 P.2d 449 (1998). The argument by the State in the instant case is not contrary to the law or evidence although it is clear that the State did not fully understand the doctrine of transferred intent.

As a corollary to this argument, the defendant contends that if the State was to be allowed to argue transferred intent, the State should not have been allowed to introduce a picture of Herrera lying on the ground with brain and skull pieces scattered throughout the area. According to the defendant, the State's purpose in introducing the photograph was to show aim and, thus, with the

argument of transferred intent, the photograph was without probative value. However, the State's main contention in this case was that the defendant aimed and intentionally killed Herrera. The fact that the State also sought to argue that even if he intended to kill just one of the group the defendant would still be guilty, does not change this main contention or diminish the probative value of the photograph. We find this contention without merit.

## III. Prosecutorial Misconduct

The majority of the defendant's claims regarding prosecutorial misconduct relate to the State's closing argument. However, the defendant identifies two comments made by the State during voir dire and opening statement. During voir dire, the prosecutor asked the jury, "Does everybody know that Mr. McCorkendale is entitled to a jury trial even if he knows he's guilty?" There was no objection to this question. In its opening statement, the prosecutor mentioned that Herrera was "brutally murdered." The defendant objected on the basis that no murder had yet been proved. The objection was overruled.

### (a) Voir Dire and Opening Argument

The defendant would have us conclude that the State's remark during voir dire was an attempt to comment on the defendant's guilt. However, it is apparent that the State, albeit unartfully, was attempting to convey to the prospective jury that every accused person is entitled to trial by impartial jury. We note that there was no objection to the State's comment, which would have given the trial court the opportunity to address the defendant's concern. We also note that immediately following this comment, the State informed the jury that it "has the burden of proof, we have to prove him guilty to a jury of his peers beyond a reasonable doubt." In light of these following comments, and the entire voir dire consisting of approximately 100 pages, we conclude that the State's comment provides no basis for reversal of the defendant's conviction.

In response to the State's "brutally murdered"comment during opening statements, defense counsel objected, stating, "Judge, I

don't usually object to opening statement, but the continued use of the word 'murder' and now associated with the word 'brutal,' no murder has been proven and I object. That's arguing her case, Judge, I don't think that's right."

The court responded:

"I don't think—that's what the charge is, is murder and she charging that it's a brutal murder that she's going to anticipate proving that with her evidence and it's going to be up to the jury to decide which of these opening statements is the most accurate, but that's what she's anticipating her evidence will be, so the objection is overruled."

The above remark of the prosecutor is not so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. While the defendant claims prosecutorial misconduct, the question on appeal is whether the trial court, in overruling the defendant's objection to the remark, abused its discretion. See *State v. Davidson*, 264 Kan. 44, 55, 954 P.2d 702 (1998). Consistent with our standard of review, we conclude that reasonable persons may differ as to the view adopted by the trial court. *State v. Harris*, 262 Kan. 778, 783, 942 P.2d 31 (1997). Accordingly, the defendant fails in his burden of showing such abuse of discretion.

We also point out that the trial court's response to the defendant's objection is consistent with the law of this state. In *State v. Campbell*, 210 Kan. 265, 278-79, 500 P.2d 21 (1972), this court noted that opening statements by counsel in criminal prosecutions are not evidence. They are given for the purposes of assisting the jury in understanding what each side expects its evidence at trial will prove and to advise the jury what questions will be presented for its decision. The tendency is to permit a prosecuting and defense attorney reasonable latitude in stating to the jury the facts he or she proposes to prove. 210 Kan. at 278-79.

In this case, the State was informing the jury that it would be attempting to prove that the defendant was brutally murdered. While the defendant argues that the use of the phrase "brutally murdered" was argumentative rather than informative, as indicated above, a reasonable person could have found the remark well within the wide latitude granted the prosecutor in stating the facts

he or she proposes to prove. Accordingly, we conclude that the trial court did not abuse its discretion in overruling the defendant's objection.

### (b) Closing Argument

Recently, this court set forth the standards to be followed on appeal in determining whether improper remarks made by a prosecutor during closing argument provide a basis for reversal. See *State v. Sperry*, 267 Kan. 287, 978 P.2d 933 (1999); *State v. Lumley*, 266 Kan. 939, 976 P.2d 486 (1999). In those cases, we stated that Kansas does not ordinarily apply the plain error rule and reversible error normally cannot be predicated upon a complaint of misconduct by the prosecutor during closing argument where no contemporaneous objection is lodged. If the prosecutor's statements, however, rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *Lumley*, 266 Kan. at 964-65. Where the appellate court, in examining a claimed error of prosecutorial misconduct, determines that the misconduct may rise to the level of violating a defendant's right to a fair trial, the claimed error will be considered. Thus, the plain error rule is recognized where the prosecutor's misconduct is so prejudicial or constitutes a constitutional violation that if not corrected will result in injustice or a miscarriage of justice. See *Sperry*, 267 Kan. at 308-09.

In cases where the issue of prosecutorial misconduct is preserved by objection at trial, and in cases where not so preserved but where the claimed error has been determined to implicate a defendant's right to a fair trial and, thus, rises to the level of a denial of the defendant's Fourteenth Amendment right to due process, the appellate standard of review is the same. See *Sperry*, 267 Kan. at 308-09. The analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process. First, the appellate court determines whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. This analysis commences with the holding that in criminal trials, the prosecution is given wide latitude in language

and in manner or presentation of closing argument as long as it is consistent with the evidence adduced. Second, the appellate court must determine whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial, requiring reversal. See *Sperry*, 267 Kan. at 309; *Lumley*, 266 Kan. 939, Syl. ¶ 12.

In determining that a prosecutor's improper remarks made in closing argument are not so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial, the reviewing court must be able to find that when viewed in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial. This is a harmless error analysis. The court must be able to declare beyond a reasonable doubt that the error was harmless. Each case must be scrutinized on its particular facts to determine whether prosecutorial misconduct is harmless error or plain error when viewed in the light of the trial record as a whole. *Lumley*, 266 Kan. at 959.

With the above standards in mind, we examine the specific contentions of the defendant with reference to the following comments made by the State during its closing argument. We note that the defendant did not object to the following remarks at trial but claims on appeal that the remarks require reversal of his conviction.

Prosecutor's comment:

"The evidence has been, and even it's really not disputed by the defendant himself, that while they were there he is the one who provoked the initial confrontation with [the] boys. If he hadn't gone up, made the gesture, what are you guys looking at me funny for; do you have a problem, this probably would never have happened."

While the defendant argues that this comment is not supported by trial evidence, the record demonstrates otherwise. Ultimately, it was the teenagers who assaulted the defendant with rocks and bottles, but the conflict was precipitated by the defendant who stopped his truck, got out, and challenged the teenagers with a statement asking them what they were looking at. The prosecutor's comment falls within that "considerable latitude the prosecutor is

allowed in discussing the evidence" as set forth in *Lumley*. We conclude there is no basis for error in this remark.

Prosecutor's comment:

"[T]hey sneak up the alley unknown to the group of boys that is still outside in front of this house and we know that some time has passed. . . .

". . . He just doesn't fire a warning shot into the air, no, he doesn't do that, he's not trying to scare them, he deliberately leans his body over this car, this gold Cutlass that is right here . . . he deliberately puts the rifle on the hood of [the] vehicle. . . . Why does he do that? If he's just trying to scare the kids, why did he take the time to lean over and have a support for the gun? Why didn't you just shoot it at the side? Why do you have to have a brace if all you're trying to do is scare somebody? . . .

. . . .

". . . If he was doing this to scare somebody, what was he trying to make them scared of? He concealed himself; they didn't know who had done it, but he was trying to send a message to this crowd of boys, hey, don't mess with me, be scared of me. He would have gone up and let them see him."

While the defendant contends that there was no evidence that he sneaked up on the teenagers or that he braced himself before firing, it is clear that the State was commenting that the defendant chose not to reveal himself to the teenagers before shooting. The evidence of record shows that the defendant put the rifle down on the hood of a car before shooting and the obvious inference is that he did so to brace the rifle. Again, the above remarks fall within that "considerable latitude the prosecutor is allowed in discussing the evidence" as set forth in *Lumley*. These remarks are not improper and provide no basis for the error claimed.

Prosecutor's comment:

"This is not an accidental killing. His reaction to it was too cold. If you accidentally kill somebody you're going to be upset about it, you're going to have some remorse about it, you're going to feel bad about doing that. All of the witnesses have said, even his best friend said he looked at the body, didn't have any reaction at all, may even had a beer in his hand when he was doing it. His reaction on the stand, you saw him yourself."

The defendant contends that this comment is improper because there was no basis for the State's conclusion. However, it is certainly permissible for the State to argue that the defendant's lack

of a reaction to the shooting would raise the inference that the defendant had intended and premeditated to kill the victim. Thus, this comment was not improper.

The defendant also argues that the following remarks were improper because the State attempted to interject race into the trial:

"Now, you can believe he either intended to kill Rogelio specifically because Rogelio is the one that threw the rock that broke out the window and damaged the truck and hurt his girlfriend or maybe he picked Rogelio out because Rogelio was standing closest to the street, was the easiest target out of all of them; maybe he picked him because he was Hispanic; he remembered seeing whites and Hispanics out there and so that had to be one of the people that damaged his truck, or maybe it was just that he was the easiest target sitting there, waiting for his ride, or it could have been that he intended to kill any one of them and killed Rogelio."

The defendant's argument takes the statement out of context. It would certainly have been inappropriate for the State to have injected race as a motive for the killing without proof. However, what the State actually argued is that it was possible that the defendant killed Herrera because he was Hispanic and some of the teenagers that damaged the truck were Hispanic making the defendant believe that Herrera was one of the teenagers that damaged the truck. Taken in context, we conclude that the above remarks of the prosecutor provide no basis for the error claimed.

The defendant also argues that the State's comment that the defendant "didn't like Rogelio, he didn't like the people—the kids that he hung out with, no good kids in the neighborhood, so he's going to take care of it himself," constitutes error. The defendant argues that it was Finger, not the defendant, who thought the teenagers were causing trouble in the neighborhood. There was ample evidence that the defendant did not like the teenagers in the neighborhood and that he decided to take matters into his own hands. His mother's statement that he was in a rage and refused her suggestion that he call the police, as well as the trouble the teenagers caused the defendant and Bulgarelli, provided ample basis for the prosecutor's remarks.

The most serious claim by the defendant concerns the lesser included offenses and the defense of voluntary intoxication. The

defendant did not object to the following remarks made by the State:

"This is an intentional killing. This is a premeditated, intentional killing. Don't get confused with all the instructions that you're going to be looking at. There is all kinds of instructions on lesser included offenses, two kinds of second degree murder are in there. There's an instruction on involuntary manslaughter. There's one on voluntary manslaughter. I'm asking that you do not even consider those. He is charged with first degree intentional premeditated murder. You have proof beyond a reasonable doubt that that's what this case is about. *You don't even have to consider those lessers. Those are thrown in to confuse you; don't consider them.*"

"He's argued, and there's an instruction on intoxication as a defense, and I'm not sure if he's saying now, well, yeah, I did do first degree murder, excuse it because I was intoxicated, but nonetheless, there's an instruction in there that *I'm going to ask that you totally disregard* because he was not intoxicated to the point that he didn't know what he was doing and that's what the instruction basically says. In order for you to think that's a defense to first degree murder, you have to think that he was totally out of it because he was drinking, he wasn't aware of what was going on in his surroundings." (Emphasis added.)

We have no hesitancy in concluding that the above remarks by the State were improper. Urging the jury not to consider instructions given by the court because they were thrown in to confuse the jury and asking the jury to totally disregard instructions given by the court constitutes prosecutorial misconduct. While the State asks this court to consider the comments in context as a statement that the jury need not consider the lesser included offenses because the evidence establishes first-degree premeditated murder, and that the voluntary intoxication instruction should be ignored because there was no evidence to support its consideration, the remarks improperly advise the jury to ignore the trial court's instruction. The effect of the State's comment was not to simply persuade the jury that the evidence had fallen short of establishing any of the lesser included offenses or failed to establish intoxication in accord with the instructions given. Rather, the argument improperly told the jury to disregard the trial court's instructions in a given area.

In accord with *Lumley* and *Sperry*, we must determine if, under the particular facts of this case, the error was harmless error. The improper remarks above are grounds for reversal only if they were

so gross and flagrant as to prejudice the jury against the accused and deny him a fair trial. For the reasons set forth below, we conclude beyond a reasonable doubt that the improper remarks of the prosecutor had little, if any, likelihood of changing the result of the trial.

The first comment made by the State that the jury may ignore the other lesser included offense instructions has some basis in law. The instruction of the trial court was to consider the first charge and then if it had its doubts to consider the next lesser offense instructed on. Thus, in context, the prosecutor argued that the jury need not go beyond premeditated murder because the evidence did not require the jury to do so. The problem with the comment was the manner in which it was presented, in that it might be subject to misinterpretation by the jury. However, the State's comment that the lesser included offense instructions were "thrown in to confuse you; don't consider them" goes beyond any latitude provided for in *Lumley*. At the same time, the trial court's instructions to the jury on lesser included offenses were clear. No error in this regard is raised. In order to credit the defendant's contention, we are required to assume that the jury ignored these instructions. In the instructions and in statements of counsel, it was said that statements of counsel are not evidence. The jury was clearly advised that it must follow the court's instructions in arriving at its verdict.

The evidence of premeditation in this case is overwhelming. The evidence establishes that the defendant was in a rage because of his previous encounter with the teenagers and wanted to get even. He left the scene to retrieve his rifle, purchased ammunition, returned after considerable delay, set his loaded rifle on the hood of an automobile, and shot the victim in the head. Moreover, the jury concluded on proper instructions that despite the amount of beer consumed by the defendant, he was able during the considerable delay between the first encounter with the boys and his rifle shot to not only form the intent to kill but also that the defendant was able to plan and premeditate the murder. While we in no way sanction the comments of the prosecutor concerning instructions,

we are able to declare beyond a reasonable doubt that the remarks had little, if any, likelihood of changing the result of the trial.

In connection with intoxication, the defendant also argues that the State gave the jury an incorrect statement of the law on voluntary intoxication by saying that in order for the jury to find that voluntary intoxication was "a defense to first degree murder, you have to think that he was totally out of it because he was drinking, he wasn't aware of what was going on in his surroundings." It must be kept in mind that there is no contention in this case that the trial court improperly instructed the jury on voluntary intoxication. The court's instructions provided the correct legal standard for the jury and constituted a correct statement of Kansas law. Nevertheless, the defendant argues that the State's argument on the law of voluntary intoxication requires reversal. As stated above, in order to credit the defendant's argument, we must assume that the jury did not follow the instructions given by the trial court. There is simply no basis in the record to establish that the jury in this case did not follow the trial court's instructions. While we agree that the remarks of the State were an incorrect statement of the law on involuntary intoxication and constitute error, we conclude beyond a reasonable doubt that such remarks had little, if any, likelihood of changing the result of the trial.

The final argument of the defendant, with regard to prosecutorial misconduct, is that the State impermissibly made an appeal to sympathy and to community values in its closing. The State, in summing up its case, told the jury:

"Some people in our community they are resorting to violence to solve their problems and that's what he did; he had a problem with these kids, he decided to take it into his own hands. He didn't like Rogelio, he didn't like the people— the kids that he hung out with, no good kids in the neighborhood, so he's going to take care of it himself. He planned this murder for over an hour and when people do that they got to be held responsible for their actions and that's your job as the jury, to hold them responsible.

"When violent [sic] is unjustified, then that person has to be punished, they have to be held responsible. Rogelio cannot stand up here and tell you for himself what happened. He can't stand here and ask you to convict this man as his killer. He can't tell you whether or not this man did it intentionally, with premeditation, but you know what happened because you heard the evidence. You should have

no doubt because there was proof beyond a reasonable doubt that this was an intentional, premeditated, cold-blooded murder. The evidence is clear, it's undeniably beyond a reasonable doubt. Do not let this man get away with this crime. You hold him responsible by convicting him of first degree murder."

We have held that a prosecutor is under a duty to insure that only competent evidence is submitted to the jury and must guard against anything that could prejudice the minds of the jurors and hinder them from considering only the evidence adduced, such as appeals to sympathy or prejudice. See *State v. Ruff*, 252 Kan. 625, 636, 847 P.2d 1258 (1993). In *Ruff*, we reversed a defendant's conviction because of an improper statement of the prosecutor during closing argument to the effect that the jurors should not allow the defendant's conduct to be tolerated in their county. 252 Kan. at 631, 636. We found that the prosecutor's statement implied that if the jury found Ruff not guilty, her conduct would be tolerated. Therefore, we further found that the statement was not harmless error. 252 Kan. at 636. It is important to note that Ruff objected to this statement but the trial court allowed it despite the objection. 252 Kan. at 631.

In *State v. Green*, 254 Kan. 669, 867 P.2d 366 (1994), we found improper the State's argument in closing: "What you [the jurors] decide will be what our community stands for." 254 Kan. at 684-85. We concluded, however, that the prosecutor's remarks were harmless error because the defense counsel did not move for a mistrial. 254 Kan. at 685.

In *State v. Zamora*, 247 Kan. 684, 803 P.2d 568 (1990), we reversed a defendant's conviction based upon the statement of the prosecutor during closing argument that " '[h]e [Zamora] has raped this victim once. If he is found not guilty, he will get away with it again.' " 247 Kan. at 689, 692. We held that this statement transcended the limits of fair discussion of the evidence and constituted reversible error. 247 Kan. at 690-91. Once again, an important part of our holding was the fact that Zamora had objected to the comment but was overruled and his later motion for mistrial based on the subject was denied by the trial court. See 247 Kan. at 689.

In the case at hand, the State did not argue that the jurors should find the defendant guilty to uphold the standards of the community

or that the defendant would, if not found guilty, commit other offenses or that the jury must render justice to the victim and convict. Rather, the State argued that the defendant should be guilty because he was guilty and should be held responsible for his crime. Nothing in these remarks provide a basis for the defendant's claim of prosecutorial misconduct. The remarks do not fall within the category of those remarks found to be error in *Ruff, Green, and Zamora*. Instead, these remarks fall within the "wide latitude in language and in manner or presentation of closing argument" set forth in *Lumley*.

Finally, contrary to the defendant's contention, the State's remarks about the victim not being there to tell the jurors what happened was not reversible prosecutorial misconduct. It may be that the statement was designed to elicit sympathy for Herrera and, thus, improper. However, improper remarks made by the prosecutor in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial. *State v. Green*, 254 Kan. at 685. Under the circumstances and facts of this case, and considering the nature of the evidence against the defendant as well as the nature of the remarks and their possible effect on the jury, we hold that these remarks, even if improper, were not so gross and flagrant as to deny the defendant a fair trial.

Affirmed.