No. 83,647

STATE OF KANSAS, *Appellee*, v. JEFFREY L. SCOTT, *Appellant*.
(21 P.3d 516)

Opinion filed April 20, 2001.

*Craig H. Durham*, assistant appellant defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the briefs for appellant. *Jeffrey L. Scott*, appellant, was on separate briefs pro se.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Charles R. Reimer*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the appellant, Jeffrey L. Scott, of his conviction for premeditated first-degree murder for the death of his ex-girlfriend, Sheryl Chappell. Scott was sentenced to life in prison. Scott raises five issues through appointed counsel and filed pro se briefs in which he raises other issues.

On January 5, 1998, police discovered Chappell's body in her home after co-workers became concerned when Chappell failed to appear for work. Chappell was found lying face down on her living room floor. Officers determined that a struggle preceded Chappell's death as a lamp was broken, pictures were knocked down, vases were broken, furniture had been moved, a large Bible on a stand had been placed upside-down, there was a large dent in the wall, and other broken items were lying about the floor. Chappell's neck had been cut by something sharp. Officers also found drops of blood all over the house.

An autopsy revealed that Chappell had been strangled, most likely manually, as there were no discernable ligature marks found. Blunt force trauma to Chappell's head also contributed to her death. Chappell had bruises about her head. Chappell had been beaten severely about the head, probably with a fist, and had sustained even more severe blows from a harder object or surface to

the back and side of her skull. The autopsy also revealed that Chappell's throat had been cut with a knife. The autopsy indicated that the cut had been made either at the time of her death or after. The deputy coroner testified at trial that the cause of death was strangulation associated with blunt force trauma to Chappell's head.

Police interviewed Scott in November 1998. Scott told officers that he had lived with Chappell in 1997, prior to meeting his new girlfriend, Natalie Ramsey. In January 1998, he had returned to Chappell's home with Ramsey to pick up some of his belongings. Scott said that Chappell had become enraged at Ramsey's presence, asked why he brought "that bitch here," and attacked Ramsey with a knife. Scott told officers that he had jumped over a couch to Ramsey's aid and pulled Chappell away from her, but not before Chappell cut Ramsey's finger. It was Ramsey's blood that officers found throughout Chappell's house. Scott screamed at Ramsey to get out of the house, which she did. Scott and Chappell had a lengthy violent struggle. Scott claimed he was attempting to defend himself from Chappell's knife thrusts. Scott admitted that he had put his hand on Chappell's throat. Scott claimed at the time that Chappell cut herself in the throat with her own knife. Scott told officers that he and Chappell fell to the floor and Chappell hit her head on a wooden table. While Scott and Chappell struggled on the floor, Scott had one hand on Chappell's neck while the other hand held down the knife. Scott held Chappell down until she became unconscious. Scott claimed that Chappell was still breathing and moving when he released her.

Scott told officers that after the fight was over, Ramsey came back into the house. Scott said he told Ramsey that Chappell had been drunk and passed out. Scott and Ramsey collected Scott's belongings. Scott tried to mop up Ramsey's blood. Scott and Ramsey then left Chappell's house.

Scott told officers that he believed Chappell was still alive when he left because he could see her breathing. Officers confronted Scott about the cut on Chappell's neck. Scott again claimed that Chappell had cut herself during the struggle. Scott eventually admitted that he had cut her himself with his own knife. He admitted

that he had originally lied to police because he felt it might show premeditation. Scott told the officers that he had taken Chappell's knife and his own knife and thrown them away in a dumpster at the apartment complex where Scott and Ramsey lived.

Scott also admitted that Chappell's head injuries did not come solely from hitting the furniture. Scott admitted that he had swung Chappell's head into the wall, causing the hole. Scott denied hitting Chappell with his fists.

Scott was charged and convicted of first-degree premeditated murder. He was sentenced to life in prison. Additional facts will be set forth as necessary throughout this opinion.

Scott raises six issues on appeal: (1) whether there was sufficient evidence to find him guilty of premeditated first-degree murder; (2) whether the trial court erred in defining "premeditation" as used in the jury instructions; (3) whether the trial court erred in responding to a jury question outside his presence; (4) whether the prosecutor's statements during closing argument were proper; (5) whether the trial court erred in giving an instruction on self-defense; and (6) whether it was error for the prosecutor to play only a portion of the audiotaped interview with Scott.

## I. PREMEDITATED FIRST-DEGREE MURDER

When the sufficiency of the evidence is challenged in a criminal case, the standard of review on appeal is whether, after review of all the evidence, viewed in a light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Graham*, 247 Kan. 388, 398, 799 P.2d 1003 (1990). A guilty verdict in a criminal case will not be disturbed on appeal if there is substantial evidence even though the evidence is entirely circumstantial. *State v. Dunn*, 249 Kan. 488, 491, 820 P.2d 412 (1991). The probative values of direct and circumstantial evidence are intrinsically similar, and there is no logically sound reason for drawing a distinction as to the weight to be assigned to each. *State v. Wilkins*, 215 Kan. 145, 156, 523 P.2d 728 (1974). When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence

or pass on the credibility of witnesses. *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988).

In order to convict Scott of first-degree murder, the State had to prove that he killed Chappell intentionally and with premeditation. K.S.A. 21-3401(a); *State v. Juiliano*,268 Kan. 89, 97, 991 P.2d 408 (1999). Scott specifically argues that there was no evidence that the killing of Chappell was premeditated.

Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 (1997); *State v. Henson*, 221 Kan. 635, 645, 562 P.2d 51 (1977). Premeditation is a "state of mind." *State v. Saleem*, 267 Kan. 100, 105, 977 P.2d 921 (1999). Premeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one. In such case, the jury has the right to make the inference. *State v. Buie*, 223 Kan. 594, 597, 575 P.2d 555 (1978). The evidence of premeditation need not be direct and is often established by circumstantial evidence. *Rice*, 261 Kan. at 586; *State v. Phillips*, 252 Kan. 937, 939, 850 P.2d 877 (1993).

Scott argues that the State failed to prove premeditation because he did not have time to think about killing Chappell "before engaging in the homicidal conduct." Scott argues that this court should consider the homicidal conduct to have begun the moment Scott began fighting with Chappell. We disagree. Premeditation does not have to be present *before* a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand. Scott had his hand on Chappell's neck until she became unconscious. His continued application of pressure over a period of time is sufficient for a jury to find that Chappell's death was premeditated.

Indeed, death by strangulation can be strong evidence of premeditation. This court hinted at as much in *State v. Brown*, 234 Kan. 969, 676 P.2d 757 (1984), where we affirmed the defendant's conviction for premeditated first-degree murder when the victim died from prolonged strangulation. In doing so, we specifically

noted that the evidence of a struggle, the beating, and then the strangulation were sufficient to show premeditation.

Other courts have specifically held that death by strangulation can support a finding of premeditation. See *Carmichael v. State*, 340 Ark. 598, 602, 12 S.W.2d 225 (2000) (premeditation can be inferred when the death is caused by strangulation); *Dupree v. State*, 615 So. 2d 713, 719 (Fla. Dist. App. 1993) (evidence of beating and strangulation sufficient to support premeditation because the strangulation gives the defendant time to "reflect upon his actions"); *Hounshell v. State*, 61 Md. App. 364, 376, 486 A.2d 789 (1985) (affirming premeditated first-degree murder conviction where strangulation took place over an "appreciable length of time" giving the defendant opportunity for "premeditation and deliberation"); *Commonwealth v. Lanoue*, 392 Mass. 583, 590, 467 N.E.2d 159 (1984) (jury may consider evidence of strangulation when determining premeditation as strangulation gives defendant time to deliberate); *People v. Johnson*, 460 Mich. 720, 733, 597 N.W.2d 73 (1999) (evidence of manual strangulation can be evidence that the defendant had an opportunity to "take a second look" or deliberate); *State v. El-Tabech*, 225 Neb. 395, 406, 405 N.W.2d 585 (1987) (holding that evidence was sufficient to support premeditated first-degree murder conviction where strangulation was "time consuming"); *State v. Richardson*, 328 N.C. 505, 513, 402 S.E.2d 401 (1991) (noting that premeditation can be inferred from the circumstances of the death, including death by strangulation); and *Beck v. Commonwealth*, 2 Va. App. 170, 176-77, 342 S.E.2d 642 (1986) (manual strangulation and suffocation were relevant to the determination of premeditation and deliberation).

Furthermore, premeditation may be inferred from various other circumstances, including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *Henson*, 221 Kan. at 639; see *State v. Sanders*, 258 Kan. 409, 414-15, 904 P.2d 951 (1995).

Scott's conduct after the struggle also supports the finding of premeditation by the jury. Scott attempted to clean up the crime scene by mopping up Ramsey's blood. Scott discarded both Chappell's knife that was used to cut Ramsey and his own knife that was used to cut Chappell's neck. Scott took affirmative and intentional steps to destroy and conceal evidence of the crime which indicates premeditation. Furthermore, Scott did not speak with police until 11 months after Chappell's death when officers came to him investigating the crime. Finally, the coroner testified that Chappell's neck was slashed as or after she died. Scott admitted to cutting Chappell's neck with his own knife after first asserting that Chappell cut her own neck during the struggle.

Scott's continuous beating of Chappell also supports the jury's finding of premeditation. Chappell suffered bruises to the head when Scott beat her. Scott threw her into the wall. Chappell had more severe wounds from a hard object or surface. After Scott had thrown Chappell into the wall and beat her in the head, Scott then strangled Chappell until she became unconscious. Chappell died as a result of the strangulation accompanied by the blunt force trauma to her head.

After reviewing all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found Scott guilty of premeditated first-degree murder beyond a reasonable doubt.

## II. JURY INSTRUCTIONS

Scott argues that the trial court erred by failing to specifically define premeditation so that the jury could determine when Scott "thought the matter" over "before engaging in the homicidal conduct."

No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 22-3414. Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the

jury would have rendered a different verdict if the trial error had not occurred. *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997).

Because Scott failed to object to the instruction given by the trial court, our review must, therefore, be whether the instruction was clearly erroneous. We hold that it was not.

The definition of premeditation used by the trial court mirrors the one used in PIK Crim. 3d 56.04(b). The definition used is a correct statement of the law. *Henson*, 221 Kan. at 645.

Scott argues, however, that the definition failed to inform the jury when the act of premeditation should have occurred in order for it to find him guilty of premeditated first-degree murder. Scott's argument here is similar to his insufficient evidence argument in that he asserts that premeditation can only occur before the entire violent episode began. Scott misunderstands the concept of premeditation. As we noted earlier, premeditation can occur during the middle of a violent episode, struggle, or fight. The State does not need to prove that Scott premeditated Chappell's death before any fighting began. Scott had his hands on Chappell's neck for a period of time, holding them there until she became unconscious. Scott could have released her at any time prior to her losing consciousness. Premeditated murder does not require a jury to consider all of the violent actions as a single indivisible episode as Scott would suggest. Instead, the jury may find that Scott's change of "state of mind," indicating premeditation, occurred any time before he caused Chappell's death. See *Saleem*, 267 Kan. at 106 (affirming premeditated first-degree murder conviction where defendant and victim had been fighting over a period of time and not evaluating events as one continuous action); *Rice*, 261 Kan. at 588 (affirming conviction for premeditated first-degree murder where fight between defendant and victim took place over a "span of time" and over "various locations outside and inside the house").

The jury instruction on premeditation was an accurate statement of the law. There was no error.

### III. RESPONDING TO A QUESTION BY THE JURY

Scott argues that his due process rights under the Fourteenth

Amendment were violated when the judge communicated with the jury out of his presence and without first securing a waiver from him.

After the jury retired, it sent the judge a question regarding the definitions. The jury asked:

"Instruction No. 12

"Does all of this pertain to premeditation?"

The judge responded without notifying either counsel. The judge stated: "This instruction defines terms used throughout the instructions."

When the jury came back with its verdict, the judge advised counsel that he had been asked a question by the jury concerning Instruction No. 12 and advised counsel as to his response. There were no objections.

Scott now argues that his due process rights were violated when the court responded to the question out of his presence. In *State v. Coyote*, 268 Kan. 726, 1 P.3d 836 (2000), we addressed this very issue. We set forth the following:

"A criminal defendant has the constitutional and statutory right to be present at all critical stages of his or her trial. A conference between a trial judge and the jury is a critical stage and requires the presence of the defendant."

"K.S.A. 22-3420(3) explicitly requires that any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is absent voluntarily."

"A trial court's failure to answer the jury's question in the presence of the defendant violates the defendant's statutory and constitutional rights."

"The failure of a trial court to answer the jury's question in the presence of the defendant is subject to the harmless error test. An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before an appellate court may declare the error harmless, it must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial." 268 Kan. 726, Syl. ¶¶ 1-4.

The judge's response to the jury question about Instruction No. 12 was correct and completely innocuous. There was no harm in the judge's response. Although the judge should have responded to the jury question in the presence of Scott, or obtained a waiver

from him, we conclude beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial.

## IV. PROSECUTOR'S CLOSING ARGUMENT

Scott argues that statements by the prosecutor during closing argument were improper and were so prejudicial that they denied him a fair trial.

This court reviewed the standard of review for prosecutorial misconduct during closing argument in *State v. Pabst*, 268 Kan. 501, 504-05, 996 P.2d 321 (2000). We stated:

"Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999). Some complained-of prosecutorial statements were not objected to at trial. If the claimed error has been determined to implicate a defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 6, 979 P.2d 1239 (1999).

. . . .

"The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. . . . Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. *State v. Lumley*, 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 (1999)."

During closing argument, the prosecutor made the following remarks:

"That does beg the question that if Natalie [Ramsey] is able to leave the house because of his actions in supposedly restraining Sherry Chappell, why couldn't he have done the same thing. Why couldn't he have restrained Miss Chappell to some point in time where he could have left. Pretty decent sized guy. Miss Chappell was somewhat of a large woman.

"But you're telling me this man here sits before the twelve of you and says I had no choice. I had to beat this woman with my hands. I had to strangle her. It's too easy to say. It's too easy to leave a human being alive and go about your business.

"How can you view the photographs of Sherry Chappell, which you need to do, because they're evidence, and then know that Jeffrey Scott has no injuries and allow any believability to the statement of self-defense. It's incredulous.

"Remember again, these are the hands of a human being that did this to another human being. Don't get desensitized by just the grotesqueness of it, because almost all of you probably have never seen something like this before. You look at it and just think can a human being do this? *Yeah, you have about eight feet separating you from the hands of a killer right here.*

"[Counsel for Defendant]: I object. That is inflammatory, not arguing any of the facts.

"THE COURT: *I'll overrule at this time. This is argument.*

"[Prosecutor]: If the hands didn't do it, what did it. Have you ever heard the saying that a dead person is speaking from the grave. You maybe heard that on TV in one capacity or another. It's not a Hollywood saying. Comes from criminal investigations like this where the police go to a scene, they find a body, an autopsy is performed on the decedent, the dead person." (Emphasis added.)

In determining whether the first prong of the prosecutorial misconduct test is satisfied, we are cautioned to remember that the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. *State v. Miller*, 268 Kan. 517, Syl. ¶ 4, 997 P.2d 90 (2000). Prosecutors may also appeal to the jury with all the power and persuasiveness that their learning, skill, and experience enable them to use. *State v. Baker*, 219 Kan. 854, Syl. ¶ 9, 549 P.2d 911 (1976).

Calling Scott a "killer" was improper, especially considering Scott did not deny having caused Chappell's death and relied upon a theory of self-defense. The use of the word "killer" is inflammatory and was outside the scope of evidence upon which the prosecutor is allowed to comment.

In *State v. McCray*, 267 Kan. 339, 347, 979 P.2d 134 (1999), this court considered a statement made during closing argument that was strikingly similar to the one made here. In *McCray*, the prosecutor stated:

" 'Someone is responsible for the murder of Onzie. Somebody is, and that somebody, ladies and gentlemen, is only feet from you. That someone as you know is Damon LaShawn McCray. Look at him, ladies and gentlemen, you have to look at him. *That's what a murderer looks like, ladies and gentlemen.'* " (Emphasis added.)

In *McCray*, we held that the prosecutor's statement was impermissible. Likewise, the statement that Scott had the hands of a "killer" was also impermissible.

In determining whether the second prong of the prosecutorial misconduct test has been satisfied, we consider: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jury. *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997). We must also consider whether the comment was sanctioned by the trial court. See *Pabst*, 268 Kan. at 509 (considering trial court's response to misconduct of prosecutor after objection by defendant); *State v. Zamora*, 247 Kan. 684, 691, 803 P.2d 568 (1990) (considering whether failure to sustain objection and admonish jury prejudiced the defendant's right to a fair trial); *State v. Salter*, 2 Kan. App. 2d 635, 637-39, 586 P.2d 62 (1978) (reversing conviction and ordering new trial where trial court stated that it was a "fair conclusion" when prosecutor stated that witness had lied).

The sole complained-of comment by the prosecutor in the present case does not rise to the level of the misconduct in the *Pabst* case. See *Pabst*, 268 Kan. at 504-09 (prosecutor calling the defendant a "liar" at least 11 times during closing argument and attempting to bolster the State's witnesses while also attempting to alter the burden of proof). There is also no evidence to suggest that there was any "ill will" on the part of the prosecutor. The comment was not so gross and flagrant as to have prejudiced the jury against Scott and deny him a fair trial.

## V. SELF-DEFENSE

Scott argues that the jury instruction on self-defense incorrectly stated the law and, therefore, denied him his right to present a defense.

As we have previously stated, no party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give

the instruction is clearly erroneous. K.S.A. 22-3414. Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *Henry*, 263 Kan. at 131.

When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case and a jury could not reasonably have been misled by them, the instructions do no constitute reversible error even if they are in some way erroneous. *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337 (1998).

The instruction concerning self-defense reads:

"The defendant has claimed his conduct was justified as self defense *and* the defense of another person.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself *and another* against such aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief." (Emphasis added.)

Scott did not object to the use of the self-defense instruction. The clearly erroneous standard therefore applies.

PIK Crim. 3d 54.17 sets forth the instruction to be used when the defendant claims self-defense or defense of another and there is evidence to support the use of such an instruction.

The use of the PIK instruction is not mandatory but strongly recommended. The PIK instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be a starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction, or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed. *State v. Mitchell*, 269 Kan. 349, Syl. ¶ 4, 7 P.3d 1135 (2000).

As we recently stated in *Mitchell*:

"We highly encourage courts to follow the language found in the PIK instructions unless the facts of the case dictate otherwise. The uniform use of PIK instruction language is a highly desirable goal, a goal which takes very little effort to effectuate. Use of the PIK instruction language helps to protect the rights of criminal defendants in our courts and significantly reduces the number of criminal appeals and issues raised in appeals of criminal cases." 269 Kan. at 357.

The first sentence of the self-defense instruction which used the word "and" was an accurate summary of Scott's claimed defense. An argument can be made, however, that the second sentence required the jury to find that Scott was attempting to defend both himself and Ramsey and that the jury could not apply the self-defense instruction unless he was attempting to defend himself and Ramsey at the same time. Although the form of the instruction used in this case is practically identical to the instruction found in the PIK, the attempt to alter or adjust the instruction to the facts in this case resulted in using an instruction that did not accurately state the law. Scott was not required to prove that while he inflicted injury on Chappell and ultimately caused her death, he was in the act of defending himself *and* Ramsey, just that he was attempting to defend himself *or* Ramsey.

Although the self-defense instruction was technically incorrect, we hold that there is no real possibility that the jury would have rendered a different verdict if the instruction would have included the word "or" in the second sentence instead of the word "and." The jury was aware that Scott claimed he was defending Ramsey when Chappell came at her with a knife. The jury was aware that Ramsey left the house and was not present or in danger when the fight continued. It was clear that Scott claimed he was merely defending himself after Ramsey was told to exit the house. The jury, having sat through the opening arguments, the introduction of evidence, and the closing arguments, could not have reasonably been misled by the instruction even though the instruction was erroneous.

## VI. PRO SE DEFENDANT

Scott argues pro se that it was error for the prosecutor to play a

portion of his interview with police but not to play the "exculpatory" portions of the tape.

A prosecutor has a duty to disclose exculpatory evidence. *State v. Atkins*, 261 Kan. 346, Syl. ¶ 17, 932 P.2d 408 (1997). In *State v. Carmichael*, 240 Kan. 149, 152, 727 P.2d 918 (1986), we stated:

"A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is material to the guilt or innocence of the defendant. Suppression of such evidence is a violation of the defendant's Fourteenth Amendment due process rights. [Citation omitted.] Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant."

In this case, the prosecutor gave copies of the tape to defense counsel long before trial. There was no attempt by Scott to introduce the tape at trial. The State made no attempt to block the introduction of the evidence at trial. This issue is without merit.

Last, Scott argues in his pro se brief that (1) he was prejudiced because there was no corroborating evidence that Ramsey had been attacked and cut with a knife, and (2) Ramsey did not testify at trial and did not present evidence that Scott did not intend to kill Chappell. These issues are also without merit.

Affirmed.