(120 P.3d 366)

No. 92,522

STATE OF KANSAS, *Appellee,* v. PATRICK C. NEAL, *Appellant.*

Opinion filed September 30, 2005.

*Patrick H. Dunn,* assistant appellate defender, for appellant.

*Brenda J. Clary,* assistant district attorney, *Charles Branson,* district attorney, and *Phill Kline,* attorney general, for appellee.

Before GREEN, P.J., HILL and CAPLINGER, JJ.

HILL, J.: In this case Patrick C. Neal punched his rape victim in the face several times. As a result, he was convicted of aggravated battery as well as rape. He now seeks to overturn the aggravated battery conviction. Because a single offense may not be divided into separate parts and the striking of the victim here occurred during a continuous series of events, we reverse Neal's conviction for aggravated battery.

We also examine other claimed trial errors of improper rebuttal testimony, prosecutorial misconduct during closing argument, and cumulative trial error, but we reject them.

## Case History

This crime was committed in Lawrence. The victim, D.G., agreed to give Neal a ride home from a bar in June 2003. On the way, they stopped at a Kwik Shop to use the restroom and get gas. When they arrived at Neal's apartment, he asked D.G. to give him a "stand-up hug." D.G. got out of the car and gave Neal a hug. According to D.G., Neal lifted her off of the ground and carried her into a grassy area on the side of the apartment building where it was more concealed from the street. He then pinned her on the ground and raped her. D.G. testified that during the rape, Neal choked her and punched her in the face. D.G. denied consenting to the sexual encounter and fought her assailant with all the might she could muster. After she was allowed to leave, D.G. drove to

the first open place she could find—a Walgreens drugstore—and told the clerks she needed help.

Neal's version of the events differs. He contended that they went to his apartment to "hang out with each other." According to Neal, the sexual activity was consensual. But when D.G. bit him on the shoulder, he "lost [his] temper" and hit D.G. in the face three times and grabbed her around the neck.

A jury convicted Neal of rape and aggravated battery. He was acquitted of aggravated sodomy and aggravated kidnapping charges. The district court sentenced Neal to 267 months for rape and a concurrent 12 months for aggravated battery.

*Multiplicity*

Neal argues that his aggravated battery and rape convictions are multiplicitous because the force that formed the basis of his aggravated battery conviction was the same force the State used to support his rape conviction. Multiplicity is a term Kansas courts use to describe the illegal practice of prosecuting a single wrongful act as several crimes.

Our rule of review is clear. "Whether convictions are multiplicitous is a question of law subject to unlimited review. [Citation omitted.]" *State v. Groves*, 278 Kan. 302, 304, 95 P.3d 95 (2004). While Neal failed to raise the multiplicity issue at trial, a claim of multiplicity may be raised for the first time on appeal when necessary to serve the ends of justice and prevent a denial of fundamental rights. 278 Kan. at 303-04.

" ' "Multiplicity is the charging of a single offense in several counts of a complaint or information. The reason multiplicity must be considered is that it creates the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights." ' [Citation omitted.]" *Groves*, 278 Kan. at 304.

This means that the State may not split a single offense into separate parts where there is a single wrongful act which does not furnish the basis for more than one criminal prosecution. However, where the criminal conduct of the defendant supports convictions for more than one crime, K.S.A. 21-3102 provides statutory au-

thority for multiple convictions even though the criminal conduct of a defendant consists of a single transaction. *State v. Mincey*, 265 Kan. 257, 262, 963 P.2d 403 (1998).

" '[U]nder Kansas law, crimes are multiplicitous where: (1) the crimes merge, that is, they constitute a single wrongful act, and the same evidence is required to prove both crimes; but if each offense requires proof of a fact not required in proving the other, the offenses do not merge; and (2) one offense is an included offense of the other as provided under K.S.A. 21-3107(2). As a result, the defendant's convictions must be analyzed not only under the traditional elements test as set forth in [*State v. Garnes*, 229 Kan. 368, 372-73, 624 P.2d 448 (1981),] but also under the legislative test for determining whether one offense is an included offense of the other.' [Citation omitted.]" *State v. Winters*, 276 Kan. 34, 42, 72 P.3d 564 (2003).

Neal maintains that because, under the State's theory, the rape and aggravated battery were "one continuing unbroken act of force," the convictions are multiplicitous.

*Analysis*

Whether Neal's convictions are multiplicitous depends to a great extent on the facts. Neal testified that the entire encounter lasted 15-25 minutes. But when D.G. bit him on the shoulder, he "lost [his] temper." Neal claimed he grabbed the back of D.G.'s necklace and pulled her down; she then slapped him. Neal "got mad" and hit her. Neal admitted that he hit D.G. in the face three times but claims that during this, D.G. began hitting him back. Neal admitted to grabbing D.G. around the neck when she bit him to calm her down and stop her from hitting him. According to Neal, the battery was "[f]airly quick" and then he felt bad and apologized. His attorney argued to the jury that Neal may be guilty of battery, but not rape.

On the other hand, D.G. testified that Neal carried her into the grassy area on the side of the apartment building and dumped all of his weight on her body, pinning her down on the ground. Because she was screaming, Neal wrapped his right hand around her throat and squeezed so she would stop. He then pulled her pants off and ripped off her underwear. Every time Neal would take his hands off of D.G.'s neck, she would scream. According to D.G., Neal "started sticking his fingers in [her] vagina" and she started

screaming so he "grew very angry that [she] was screaming" and hit her in the eye with a closed fist.

Neal again inserted his fingers into D.G.'s vagina; she screamed and tried to fight back. Neal pulled his right hand back in a clenched fist and said, " 'Do you want me to beat you again?' " He then continued raping D.G. and had his hands around her throat and slammed her head into the ground several times. D.G. testified that she lost consciousness twice because Neal was squeezing her throat so tightly. According to D.G., at one point Neal turned her over and made her get on her hands and knees. Neal then inserted something into D.G.'s vagina and anus.

D.G. testified that she distinctly remembered Neal hitting her in the face at least twice. When asked by the State what Neal was doing prior to hitting her, she said, "[H]e had his hands inside of me." According to D.G., after a while Neal stopped attacking her. Neal then asked D.G. if she wanted to get into his car with him. D.G. told him that she had to pick up her roommate, gathered her clothes, and ran to her car. D.G. denied consenting to any sexual activity with Neal.

Because the jury convicted Neal of rape, we conclude that the jury believed D.G.'s version of the events. This court does not reweigh evidence or redetermine the credibility of witnesses. *State v. Mays*, 277 Kan. 359, 363, 85 P.3d 1208 (2004). Under D.G.'s version, the rape and battery appear to have been a continuous series of events.

Our Supreme Court has stated that the only remaining test for multiplicity is the common-law elements test. *State v. Schuette*, 273 Kan. 593, 601, 44 P.3d 459 (2002). Under the elements test, crimes are multiplicitous where all the "elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 2004 Supp. 21-3107(2)(b). But, in *Groves*, the court cautioned that the lesser included analysis under K.S.A. 21-3107 does not affect the single act of violence paradigm concerning multiplicity. 278 Kan. at 305.

In *Groves*, the defendant grabbed the victim's purse in a parking lot. During the struggle, the victim was thrown to the ground, suffering a fractured sacrum. The jury convicted Groves of aggravated

robbery and aggravated battery. Groves appealed, arguing his convictions were multiplicitous because they arose out of the same act of violence. *Groves*, 278 Kan. at 303.

The court stated: "Kansas has recognized some form of the 'single act of violence' paradigm for years. [Citation omitted.]" 278 Kan. at 307. Therefore, the court determined that, under the specific facts of the case, the single act of violence test applied and controlled, "especially since the pushing down and purse robbing did not just occur at 'approximately the same time and place,' but apparently they were both virtually contained in one physical motion." 278 Kan. at 307.

An earlier example is found in *State v. Cathey*, 241 Kan. 715, 741 P.2d 738 (1987), where Cathey and his brother beat and shot the victim, believing he had beaten their brother. Cathey was convicted of aggravated battery and attempted murder but appealed, arguing his convictions were multiplicitous. The court examined the case and held:

"Where there is only one victim and two acts of violence—a beating and a shooting—occurring at approximately the same time and place, the person who inflicts such injuries cannot be charged with both aggravated battery and attempted murder. To hold otherwise would be inconsistent with our reasoning in *Garnes* that when a series of violent acts occurs simultaneously, it is multiplicitous to charge both aggravated battery and attempted first-degree murder." 241 Kan. at 719-20.

In *State v. Garnes*, 229 Kan. 368, 372-74, 624 P.2d 448 (1981), the court had determined an aggravated battery conviction was not multiplicitous with an attempted murder conviction because the shooting that supported the aggravated battery conviction occurred at an earlier time and place. The shooting was a separate and distinct act from the stabbing, running over, and abandoning that later occurred in a different location. However, since the stabbing, which supported the aggravated battery conviction, occurred simultaneously with the running over of the victim and abandoning her, the aggravated battery by stabbing conviction was multiplicitous with the attempted murder conviction. 229 Kan. at 372-74.

The battery and rape here are similar to the beating and shooting in *Cathey*. Here, there was only one victim and two technical acts of violence—rape and battery—occurring at approximately the

same time and place. As in *Cathey* and *Garnes*, the rape and battery appear to be violent acts occurring simultaneously and the perpetrator cannot be charged with and convicted of both crimes.

But we cannot stop there. Not only the sequence of events must be considered in analyzing multiplicity. In *State v. Perry*, 266 Kan. 224, 230, 968 P.2d 674 (1998), the defendant beat the victim into unconsciousness and then shot her. He was convicted of aggravated battery and attempted first-degree murder. Perry appealed, arguing that his convictions were multiplicitous because there was only one single criminal act. Our Supreme Court stated that in analyzing whether there were two distinct criminal acts, it must consider the State's complaint, the jury instructions, and the evidence presented at trial. Because the State's charging document did not distinguish between the beating and shooting, the jury instructions did not require the jury to distinguish between the pistol whipping and the shooting, and the evidence did not indicate distinct acts, the convictions were multiplicitous. Thus, the court reversed the aggravated battery conviction because it could not be said that the convictions did not arise out of a single wrongful act. 266 Kan. at 230.

The State argues that the victim's testimony, medical testimony, and photographic exhibits establish that Neal went far beyond the force used to accomplish rape. Yet, the same act of violence, which could include throwing the victim to the ground, choking her, punching her, and slamming her head into the ground, has been used to prove both crimes. There was no distinction made in the charging document or jury instructions about what acts of violence constituted the force or fear to support the rape charge versus what acts constituted the great bodily harm to support the aggravated battery charge. The verdict forms provide no distinction. Likewise, the evidence presented at trial does not indicate that the convictions for rape and aggravated battery did not arise out of a single wrongful act. Therefore, when we apply the single act of violence paradigm, the facts of this case lead us to conclude that Neal's convictions for rape and aggravated battery are multiplicitous.

Furthermore, an additional problem with the State's argument that the battery went "far beyond the force used to accomplish rape" is its imprecision. How much force is necessary to rape some-

one? By what gauge do we measure violence? Is not each victim unique? This was a horrible crime committed with great continuous violence during its entire course; therefore, the application of single act of violence paradigm is appropriate here.

We now turn to Neal's other claimed errors.

### Rebuttal Testimony

Neal contends the admission of D.G.'s rebuttal testimony about her overbite violated his right to a fair trial, arguing that her testimony was cumulative and provided no specialized guidance for the jury.

Neal's theory of defense was that he and D.G. had a consensual sexual encounter that escalated into battery when D.G. bit him on the shoulder. Neal also testified that D.G. playfully bit his arm while they were dancing at the bar before D.G. gave him a ride home. D.G. testified in the State's case in chief that Neal had informed her that some girl was joking with him in the bar and bit him on the shoulder. The defense offered into evidence two photographs taken by police officers that depict bite marks on Neal's right shoulder and right arm. According to a detective's report, Neal said the bite marks were from "[s]ome girl at the bar."

Following the defense's case presentation, the State called D.G. as a rebuttal witness to testify regarding the bite marks. Over defense objection, the court allowed D.G.'s testimony for the limited purpose of "allowing her teeth to be shown and explain[ing] her teeth to the jury" because the State did not have prior notice of testimony regarding the bite marks.

During rebuttal, D.G. testified that during the sixth and seventh grade, she had braces. After the braces were removed, she was supposed to wear a retainer but did not. Because of this, D.G. has "quite a pronounced overbite." According to D.G., she had observed "something" that she had bitten in the past, and her overbite appeared very evident. D.G. testified that the bite marks in the photographs are not consistent with her bite pattern. D.G. showed her overbite to the jury.

Upon cross-examination, D.G. admitted she had not visited with any experts to determine if the particular bite marks in the pho-

tographs matched her bite. Her testimony was simply based on her experience.

Neal erroneously contends that rebuttal evidence must come from a new, independent source. But rebuttal evidence need not be from a different source. See *State v. Synoracki*, 253 Kan. 59, 65, 853 P.2d 24 (1993). Moreover, contrary to Neal's assertion, D.G. did not specifically testify in rebuttal that she did not bite Neal. Although this assertion could be inferred from her testimony that the bite marks were inconsistent with her overbite, D.G's testimony could not be considered cumulative because it did not restate facts provided in her original testimony.

Next, Neal contends the State's questioning of whether D.G.'s bite pattern was consistent with the photographs was contrary to K.S.A. 60-456 and violated his right to a fair trial. According to Neal, this testimony was erroneous because "the State presented no testimony to suggest that D.G. had any sort of specialized training or knowledge of bite pattern analysis that would allow her to better compare her teeth to the exhibits."

D.G.'s testimony both contradicted Neal's testimony and corroborated her earlier testimony. The State is not required to anticipate defense testimony and provide anticipatory witness testimony in its case in chief. See *State v. Willis*, 240 Kan. 580, 583, 731 P.2d 287 (1987). A witness is not precluded from corroborating his or her prior testimony during rebuttal. See *Synoracki*, 253 Kan. at 65. As such, it cannot be said the trial court abused its discretion in the admission of D.G.'s rebuttal testimony. See *State v. Hayes*, 239 Kan. 443, 445-46, 720 P.2d 1049 (1986) (not improper for State to call witness to rebut defense witness' testimony of trauma in forcible rape cases when case in chief limited to specific circumstances of rape case).

Primarily, Neal maintains that D.G. was an improper lay witness. Again, the admission of evidence lies within the discretion of the trial court. "If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of

discretion. [Citation omitted.]" *State v. Jenkins*, 272 Kan. 1366, 1378, 39 P.3d 47 (2002).

K.S.A. 60-456 allows lay opinions if the court finds them rationally based on the witnesses' perceptions:

"(a) If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony."

A lay witness may testify regarding external appearances and manifest medical conditions readily apparent to anyone. *Hiatt v. Groce*, 215 Kan. 14, 21, 523 P.2d 320 (1974). Therefore, D.G. was competent to testify that she had an overbite as a result of not wearing a retainer. Furthermore, it was reasonable for her during rebuttal to provide her opinion regarding the comparison of the bite marks in the photographs with her own bite, which she had observed on previous occasions. There is no error here.

*Misconduct During Closing*

Neal claims the following statements made by the prosecutor in his closing argument amount to prosecutorial misconduct:

"When we first started this case, when we did jury selection, I asked each of you—actually as a group, all thirty-six of you at that time—do you know what a rapist looks like. Now, Mr. Miller would have you think that [D.G.] should have known better when she was at the Kwik Shop, because by that time Patrick Neal was already putting his hands on her.

"She knew him as 'Chris' at that time. Chris was putting his hands on her. And she should have known better than to give this guy a ride home the rest of the way unless she was ready to have sex with him, because she could have gotten away from him at the Kwik Shop.

"But, ladies and gentlemen, you didn't know what a rapist looked like before we started this trial. And until June 6th of 2003, [D.G.] didn't know either. She didn't know what awaited her in the dark corner of the parking lot of the defendant's apartment complex.

"If she had it to do over, would she do it differently? You can think about that all you want. You didn't know what a rapist looked like, but Mr. Miller would expect for [D.G.] to know at the Kwik Shop at 6th and Kasold.

. . . .

"She didn't know what a rapist looked like until June 6th of 2003. But now I submit to you, ladies and gentlemen, you know a rapist—

"MR. MILLER: Objection, Judge. From what he looks like, is that what she's saying?

"MS. WILSON: No, it's not.

"THE COURT: All right. Clarify that, please.

"MS. WILSON: You know a person who has committed the crime of rape. The person is in this courtroom. You've been looking at him for two-and-a-half days. This defendant is guilty of the crime of rape, of the crime of aggravated kidnapping, the crime of aggravated criminal sodomy, and the crime of aggravated battery."

Reversible error based on prosecutorial misconduct must show the alleged error denied the defendant his or her right to a fair trial under the Fourteenth Amendment. *State v. Davis*, 275 Kan. 107, 121-22, 61 P.3d 701 (2003). A two-step process is used to analyze allegations of prosecutorial misconduct. First, we must decide whether the comments were outside the wide latitude for language and manner that a prosecutor is allowed when discussing the evidence. The second step requires the court to decide whether the prosecutor's remarks constitute plain error, *i.e.*, whether the statements are so gross and flagrant as to prejudice the jury against the defendant and deny the defendant a fair trial, requiring reversal. *Davis*, 275 Kan. at 121.

Factors to consider under the second step are whether the comments show ill will by the prosecutor, whether the evidence against the defendant was so overwhelming that the prosecutor's misconduct had little or no likelihood of having changed the result of the trial, and whether the trial court sanctioned the comment. *State v. Scott*, 271 Kan. 103, 115, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001).

Each case is scrutinized on its own particular facts in light of the record as a whole to determine whether the misconduct is so prejudicial as to deny the defendant a fair trial. See *State v. McCorkendale*, 267 Kan. 263, 979 P.2d 1239 (1999).

In determining whether the first prong of the test is satisfied, this court must remember that the prosecution is given wide latitude in language and in manner of presentation as long as the argument is consistent with the evidence. *Scott*, 271 Kan. at 114. Where a trial court sustains an objection to a prosecutor's comments during closing argument, grounds for assertion of error do

not remain unless the remarks are so prejudicial as to be incurable. *State v. Webber*, 260 Kan. 263, 286-87, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090 (1997). In this case, Neal's objection was essentially sustained by the trial court. However, the court did not admonish the jury to disregard the prosecutor's statements. See *State v. Washington*, 275 Kan. 644, 672, 68 P.3d 134 (2003) (instance of alleged misconduct disregarded when trial court admonished jury). Thus, this court cannot dismiss Neal's argument of alleged misconduct; therefore, it must be determined whether the statements were so prejudicial as to be incurable.

Neal compares the prosecutor's comments in this case to closing arguments in *State v. Scott*, 271 Kan. at 113-14, and *State v. McCray*, 267 Kan. 339, 344-47, 979 P.2d 134 (1999). In *Scott*, the prosecutor stated during closing argument, "Yeah, you have about eight feet separating you from the hands of a killer right here." 271 Kan. at 114. The court determined that calling Scott a "killer" was improper because the word is inflammatory and its use was outside the scope of evidence upon which a prosecutor is permitted to comment. Because there was also no evidence of ill will on the part of the prosecutor, the court determined the comment was not so gross and flagrant as to have denied Scott a fair trial. 271 Kan. at 115.

In *McCray*, among many other complained-of comments, the prosecutor stated during closing argument:

" 'Someone is responsible for the murder of Onzie. Somebody is, and that somebody, ladies and gentlemen, is only feet from you. That someone as you know is Damon LaShawn McCray. Look at him, ladies and gentlemen, you have to look at him. That's what a murderer looks like, ladies and gentlemen.' " *McCray*, 267 Kan. at 347.

The court held that the prosecutor's statements constituted error because it is improper for a prosecutor to inject his or her personal opinion of the defendant's guilt. 267 Kan. at 347. However, as in *Scott*, the court found that the prosecutor's numerous improper statements had little, if any, likelihood of having changed the result of the trial. 267 Kan. at 351.

The statement, "But now I submit to you, ladies and gentlemen, *you know a rapist,*" is quite comparable to the improper statements

in *Scott* and *McCray*. It seems from this statement the prosecutor was insinuating that the jury knew what a rapist looked like from looking at Neal. However, unlike the prosecutor in *Scott* calling the defendant a "killer" and the prosecutor in *McCray* specifically stating that the defendant was what a "murderer look[ed] like," the prosecutor here did not specifically call Neal a "rapist." Rather, it seems defense counsel's objection halted the prosecutor's improper comments.

The prosecutor's comment, "you know a rapist," was outside the considerable latitude allowed in discussing the evidence, but Neal has failed to establish that the closing argument was so gross and flagrant that it denied him a fair trial. No ill will on the prosecutor's part is evidenced by the statements. The prosecutor appears to be responding to defense counsel's assertion that D.G. could have left Neal at the Kwik Shop if she had any reservations. The comments constitute only a few lines in a trial transcript of over 1,200 pages.

The evidence in this prosecution is horrific. The State presented 68 exhibits during a 2-day trial, which corroborated D.G.'s testimony. The officer who first reported to Walgreens testified that D.G. appeared to have suffered quite a bit of trauma and was terrified when he took her back to the apartment building. Numerous photographs were admitted showing the physical injuries D.G. suffered. D.G.'s torn and muddy jeans, underwear, and bra were admitted into evidence. Likewise, D.G.'s artificial nails that were ripped off during the struggle were admitted. An officer testified D.G.'s underwear and fingernails were found in the area outside the apartment building.

Furthermore, Lori Tilson, a sexual assault nurse examiner, testified that D.G. exhibited general swelling and redness of the labia majora and minora consistent with blunt trauma. According to Tilson, D.G. suffered potentially life-threatening injuries, which were consistent with her story. Additionally, a forensic scientist and biologist for the KBI testified that tests revealed sperm on both the rectal and vaginal swabs of D.G. DNA tests of the sperm on D.G.'s vaginal swab matched the DNA tests of Neal's sperm.

We do not think that the comments denied Neal a fair trial.

*Cumulative Error*

Neal's final issue on appeal alleges that cumulative error deprived him of a fair trial.

" ' "Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant." ' [Citations omitted.]" *State v. Kirby*, 272 Kan. 1170, 1191-92, 39 P.3d 1 (2002).

In this case, the only error requiring reversal is the multiplicity of Neal's convictions. D.G.'s rebuttal testimony was not improperly admitted, and the prosecutor did not commit reversible misconduct in her closing argument. Thus, there is no trial error, cumulative or otherwise, that would require reversal of Neal's rape conviction.

Affirmed in part and reversed in part.