MODIFIED OPINION[1]

NOT DESIGNATED FOR PUBLICATION

No. 126,224

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAMES D. DAYVAULT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Submitted without oral argument. Original opinion filed May 10, 2024. Modified opinion filed June 14, 2024. Conviction affirmed, sentence vacated, and case remanded with directions.

*Samuel Schirer*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HILL, P.J., SCHROEDER, J., and MARY E. CHRISTOPHER, S.J.

PER CURIAM: James D. Dayvault was convicted by a jury of aggravated indecent liberties with a child and sentenced by the district court. Dayvault now timely appeals

---

[1]**REPORTER'S NOTE**: Opinion No. 126,224 was modified by the Court of Appeals on June 14, 2024, in response to the defendant's motion for modification. The additional language appears at slip op. at 20-22.

1

raising seven claims of error: (1) The district judge made improper comments in its preliminary instructions to the jury; (2) the State committed a *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), violation by not disclosing exculpatory evidence until the middle of trial; (3) the State committed prosecutorial error by making comments in its opening statement insinuating the jury would see a video of Dayvault's vehicle at the scene of the crime, which was not later admitted into evidence during the State's case-in-chief; (4) the district court erred by not giving the jury a limiting instruction for its consideration of prior sexual misconduct evidence under K.S.A. 2022 Supp. 60-455(d); (5) cumulative error denied him a fair trial; (6) the district court imposed an illegal sentence when it denied his departure motion but nonetheless imposed a grid-based sentence; and (7) the district court erred by ordering him to pay lab fees in excess of what is allowed by statute.

After a careful review of the record, we find Dayvault's first five claims of error unpersuasive; therefore, we affirm his conviction. However, we agree the district court erred in imposing a grid-based sentence and further erred in imposing excess lab fees. Accordingly, we vacate his prison sentence and the order for payment of lab fees and remand for resentencing so the district court can impose the correct sentence under K.S.A. 2015 Supp. 21-6627(b)(2)(B) and the proper lab fees under K.S.A. 28-176.

FACTUAL AND PROCEDURAL BACKGROUND

On November 15, 2015, H.H., who was seven years old at the time, was playing by herself in a field near her home in Wichita. A white four-door vehicle pulled up near H.H., and a man stepped out. The man asked H.H. for her name, then opened her pants, placed his hand inside her underwear, and rubbed the exterior of her vagina. H.H. noticed the man was also holding his exposed penis and screamed when she saw it. The man covered H.H.'s mouth with his hand to stop her from screaming. H.H. ran to her house, and the man ran back to his vehicle.

2

H.H.'s mother was outside of the house when H.H. returned home and reported what happened. Around the same time, H.H.'s mother noticed a white car driving away and immediately called the police to report what happened. Law enforcement responded, and H.H. described her attacker as a white male in his 30s or 40s with brown hair and a goatee. H.H. then went to the police station for an interview, where she recounted the relevant events as described above. Later, H.H. was taken to a hospital for a physical examination. A nurse took swabs from the area around H.H.'s genitals and the area around H.H.'s mouth. These swabs were placed in a sexual assault kit for examination, although it was not immediately submitted to the Kansas Bureau of Investigation (KBI) for testing.

The following day, Officer Charles Byers canvassed the crime scene and surrounding area. Byers observed a nearby steel factory just down the street from the crime scene. Byers contacted employees of the steel factory and obtained security footage from around the time of the incident. Byers reviewed the footage and noted two white cars had driven by the factory—a Buick Century with front fender damage and a Dodge Intrepid with a window decal. According to Byers, the video showed a white car pull up to the field where H.H. was sexually assaulted, park for some time, and then drive away.

Over the next several days, officers located and stopped the white Buick from the surveillance footage. The Buick's driver was female and told the officers the owner was also female. Detective David Wertz was able to make out the license plate number of the white Dodge Intrepid from the security video and discovered it was registered to the James Dayvault Trust. At the time, Dayvault lived at an address near H.H.'s home. However, for reasons not explained in the record, law enforcement's investigation stalled for several years, and Wertz admitted he did not contact Dayvault at that time.

In June 2017, Officer Rex Leffew received a report of a man following and taking pictures of a young girl who was wearing a swimsuit. The man was observed leaving the area in a white Dodge Intrepid, and the reporting party advised law enforcement of the license plate number. From the plate number, Leffew was able to determine the address of the registered owner. Leffew went to the address and contacted Dayvault. Dayvault admitted he was the person who had followed and photographed the young girl. Dayvault also admitted he took the pictures "to have sexual fantasies." But Dayvault told Leffew he only managed to capture pictures of the ground, so he had deleted the photos. Dayvault also told Leffew he had "inappropriate urges about kids, but [he] never touched any." When law enforcement searched the contents of Dayvault's cell phone and emails, they discovered a video taken near the area where Dayvault had been photographing the young girl, which showed Dayvault holding his exposed penis.

About two years later, the KBI received a grant to perform lab testing on all the untested sexual assault kits in the state, which resulted in H.H.'s 2015 sexual assault kit being tested. The test of the swab taken from H.H.'s genital area only showed the presence of H.H.'s DNA. The test of the swab taken from around H.H.'s mouth showed H.H.'s DNA and another unknown DNA profile. This unknown profile was submitted to a national database, and the KBI received a "hit" for Dayvault. A known sample from Dayvault was later tested and matched the unknown profile from the mouth swab in H.H.'s sexual assault kit.

With the DNA test results in their hands, law enforcement reopened its investigation into H.H.'s sexual assault with Dayvault as their primary suspect. Detectives interviewed Dayvault, and he again admitted he was sexually attracted to children. The detectives showed Dayvault photos of the area where H.H. was sexually assaulted, and he told them he recognized the area. Dayvault also admitted he drove a white Dodge Intrepid at the time H.H. was sexually assaulted. The detectives showed Dayvault a

4

picture of H.H., but Dayvault said he did not recognize her. Dayvault said he could not think of any reason his DNA was found on H.H.

In February 2021, the State charged Dayvault with one count of aggravated indecent liberties with a child, and a jury convicted him as charged in November 2022. Prior to sentencing, Dayvault filed a motion for new trial and a motion for downward dispositional and durational departure. The district court denied both motions at sentencing. The district court then applied a special rule that it believed required imposing a determinate, grid-based sentence of 653 months' imprisonment given Dayvault's criminal history score of A. In its journal entry of sentencing, the district court also ordered Dayvault to pay three KBI lab analysis fees of $400 each. Additional facts are set forth as necessary.

ANALYSIS

*We Observe No Judicial Comment Error*

Dayvault first argues the district judge erroneously told the jury he might be conducting work on his computer unrelated to Dayvault's case during the trial and it should not concern itself with anything he was doing at the bench. Dayvault asserts this was judicial comment error, which conveyed to the jury Dayvault's trial was not important enough for the judge to give his full attention.

*Standard of Review*

Judicial comment error occurs when a judge makes erroneous comments in front of a jury that are not jury instructions or legal rulings. *State v. Boothby*, 310 Kan. 619, 626, 448 P.3d 416 (2019). We exercise unlimited review over claims of judicial comment error, which involves a two-step process. First, we determine whether the comment was

erroneous in light of all the relevant facts and surrounding circumstances. Second, if the comment was erroneous, then we must determine whether the defendant's right to a fair trial was prejudiced. The party benefiting from the error—here, the State—must prove the erroneous comment was harmless beyond a reasonable doubt. 310 Kan. at 626-27.

*Discussion*

In his preliminary instructions to the jury, the district judge stated, in relevant part:

"Don't concern yourself with the reasons for my rulings. My rulings are not expressions of my opinion of this case or how you should decide it. I don't have an opinion on how you decide the case.

"When I'm making rulings on objections, or anything else, those are legal rulings that have nothing to do with an opinion or a feeling. It's not saying: 'Well, I've sustained all these objections to one side, so now I've got to sustain an objection to the other.' It doesn't work that way. So don't concern yourselves with the reasons for my rulings.

"At times we may need to take up legal matters outside your presence. I may send you back to the jury room. I'll try to keep that to a minimum. Sometimes we'll address things up here at the bench. . . .

"Don't concern yourself with the reasons for those conferences. If you're asked to step out, don't concern yourself with those. Don't draw any inferences or conclusions from my rulings, or speculate about them. Again, I don't have an opinion.

"My mannerisms, my facial expressions, my speech and my actions, including note-taking, are not expressions of my opinion of this case or how you should decide it.

"I have access to a computer here. There are emails coming in. I am trying to do other work, if I can. So I may be responding to something totally unrelated to this case when I pick up a pen and start taking notes.

"I will work throughout the case on jury instructions, but they can't be completed until the end. So don't look to me for guidance. And don't say: 'Oh, the judge is picking up his pen; this must be something important.' It may be I'm just making a note to myself that I need to pick up something on my way home from work tonight. So don't do that."

6

Dayvault takes exception to the last two paragraphs of the judge's above-quoted statements. He argues the comments were erroneous because they (1) "created an appearance of impropriety" and (2) "invited jurors to take their own responsibilities less seriously."

The State correctly argues Dayvault is asking us to find error by isolating select comments from a much lengthier explanation the judge gave the jury in its preliminary instructions. In fact, the judge's full preliminary instructions were far more comprehensive than the portion quoted above. The judge prefaced his instructions by telling the jury:

> "Some of these instructions I'm required to give; so I may read from the required instructions. I may deviate a little bit from that. And then I have my own set of instructions that I hope will assist you with understanding the process and how things will go throughout the trial."

The judge then gave the jury the preliminary instructions he was required to give. Shortly before making the comments at issue here, the judge told the jury:

> "All right. So those are some of the instructions that I should give, or [I am] required to give. Now these are some that I hope will assist and guide you throughout the trial.
> "Your role as jurors and my role are different in this case. You are the trier of facts. You decide the case. After you have received the evidence and I've informed you of the law that applies to the case, you'll gather in the jury room to discuss and decide the case.
> "As a judge, I decide what evidence you hear and what instructions you should receive, and I decide all questions of law, and control the progress of the trial. But I don't decide the case—you do."

7

We find the judge's comments here were not erroneous in the overall context in which they were made. The judge certainly could have used more artful language or omitted some of his statements; however, that does not make them erroneous. Here, the judge's overall message to the jury was about the difference between the role of the judge and the role of the jury. The judge directed the jury to keep an open mind during trial and not draw any inferences from his actions on the bench. This is an eminently proper instruction even if the judge may have chosen a poor example of things he could be doing on the bench.

In any event, the State persuasively argues the error—if any—was harmless beyond a reasonable doubt. The comments Dayvault complains of were brief, isolated, and uttered during a far lengthier set of otherwise appropriate preliminary instructions. Nothing in the record reflects the judge or the jury did not give their full attention during trial.

After the close of evidence, the judge instructed the jury:

"At times during the trial, I have ruled upon the admissibility of evidence. You must not concern yourself with the reasons for these rulings. I have not meant to indicate any opinion as to what your verdict should be by any ruling that I have made or anything that I have said or done."

The judge explained the jury's only concern was determining if Dayvault was innocent or guilty. The judge told the jury it should consider everything admitted into evidence in reaching its verdict. However, the jury was not to consider anything not admitted into evidence and disregard statements, argument, or remarks by the parties if they were not supported by the admitted evidence. We presume the jury followed the instructions given. *State v. Corey*, 304 Kan. 721, 734, 374 P.3d 654 (2016).

Here, any comments in the short, isolated statements from the judge's preliminary instructions would have been greatly attenuated by the three-day jury trial in which the jury heard testimony from more than a dozen witnesses. Any remaining effect would have been resolved by the judge's instructions at the close of evidence, informing the jurors of their responsibilities. And given the strength of the evidence, we are unpersuaded the judge's passing comments had any effect on the jury's verdict. Thus, we find no judicial comment errors and, if erroneous, the State has clearly shown they were harmless beyond a reasonable doubt.

### The Alleged Brady *Violation Does Not Warrant a New Trial*

Dayvault next argues the State failed to timely disclose exculpatory evidence in violation of *Brady*. Accordingly, he asserts the district court erred in denying his motion for a new trial.

#### *Standard of Review*

"[A] trial court's determination as to the existence of a *Brady* violation is reviewed de novo with deference to a trial court's findings of fact, but the trial court's denial of the defendant's motion for new trial is reviewed under an abuse of discretion standard." *State v. Warrior*, 294 Kan. 484, 510, 277 P.3d 1111 (2012). "A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact." *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021).

Under *Brady*, prosecutors have an affirmative duty to disclose evidence favorable to the accused when "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Law enforcement's knowledge of evidence is imputed to the State; therefore, a *Brady* violation

can occur when material evidence known to law enforcement is withheld even though it is not known to the prosecutor. There is no distinction between exculpatory evidence and impeachment evidence when it comes to what constitutes evidence favorable to the accused. *Warrior*, 294 Kan. at 506.

> "There are three components or essential elements of a *Brady* violation claim: (1) "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching" [citation omitted]'; (2) "'that evidence must have been suppressed by the State, either willfully or inadvertently" [citation omitted]'; and (3) the evidence must be material so as to establish prejudice." 294 Kan. at 506.

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

*Discussion*

As a preliminary matter, the State argues we should not review this issue because Dayvault is raising it for the first time on appeal. But Dayvault raised the issue in his motion for new trial, which was denied at sentencing. We therefore reject the State's preservation argument. For all intents and purposes, Dayvault is arguing the district court abused its discretion in denying his motion for a new trial based on an error of law. The *Brady* violation was clearly alleged in Dayvault's motion for new trial. In its findings, the district court addressed the late disclosure of evidence in denying Dayvault's motion.

Before addressing the merits, some additional factual background is necessary. During the original investigation in 2015, Byers reviewed surveillance video from the nearby steel factory and found two videos depicting white cars near the crime scene.

10

From the factory's north-facing camera, Byers recovered a roughly four-and-a-half-minute video, which briefly showed a white Buick Century driving near the area. The Buick remained out of frame for over three minutes before reappearing and driving southbound on H.H.'s street. From the east-facing camera, Byers recovered a 24-second video, which showed a white Dodge Intrepid driving northbound on H.H.'s street. A still image of the Dodge Intrepid was taken from this video and subsequently used in the investigation.

When the State finally charged Dayvault in 2021, prosecutors only had the long north-facing video. The short east-facing video and the still image taken from it were thought to be permanently lost. Wertz acted as the lead detective, and the videos had been stored on Wertz' department-issued computer. However, the hard drive on Wertz' computer crashed, and Wertz believed the files were irretrievable. As the trial commenced, Wertz made a "last-ditch effort" to locate any evidence related to the case, which he thought was lost in the hard drive crash. Wertz was able to locate the still image taken from the video, which he emailed to the prosecutor on the second day of trial. The prosecutor promptly forwarded Wertz' email to Dayvault's trial counsel. The State entered the still photo of the white Dodge Intrepid into evidence later that afternoon without any objection from Dayvault.

The week before trial, Byers reviewed the long video while meeting with the prosecutor. But during his testimony on the second day of trial, Byers became confused as to which of the two relevant videos he had reviewed the week prior, although neither was ultimately admitted at trial. That night, Byers searched his emails for anything related to the videos and found an email wherein an employee of the steel factory had attached the short east-facing video. The following morning, Byers forwarded the email and the attached video to the prosecutor and defense counsel. Subsequently, the prosecutor informed the district court during a bench conference that while the video was "arguably inculpatory," the State would not seek to admit the video due to Byers' late

11

disclosure. The State further indicated it would not object if Dayvault wanted to introduce the video. Ultimately, though, neither the defense nor the prosecution sought to admit either the east-facing or north-facing videos.

After he was convicted by the jury, Dayvault filed a motion for new trial, arguing, among other things, the State had committed a *Brady* violation through its late disclosure of the east-facing video and the still frame taken from it. Prior to sentencing, the district court heard testimony from Byers and Wertz explaining how the short video and still photo were lost and later recovered. In denying Dayvault's motion for new trial, the district court did not explicitly address the *Brady* claim. However, the district court found:

> "The destruction of the hard drive was not purposeful. And the explanations as to how the evidence was recovered through the actions of the other officers and then the State turning that over late, of course much better if it had been turned over earlier. But as of the officers that were testifying to, they were preparing for trial and discovered these matters and these items and turned it over to the defense. There was no request to continue either to have a night or a day to review it or a few hours or to continue the trial. And for those reasons I will deny the motion for new trial."

With this additional factual background in mind, the State is generally correct in arguing there was no *Brady* violation that prejudiced Dayvault. The State does, however, unpersuasively argue a *Brady* violation cannot occur where the evidence was disclosed during trial. In support of its argument, the State relies entirely on authorities from other state and federal courts. In response, Dayvault correctly points out precedent from our Supreme Court in *State v. Hirsh*, 310 Kan. 321, 336, 446 P.3d 472 (2019), stating: "[D]elayed rather than absent disclosure of exculpatory information may or may not qualify as a *Brady* violation, depending on whether the defendant can establish prejudice due to his or her inability to use the *Brady* material effectively at trial."

12

The State persuasively outlines how the late disclosure fails to create a *Brady* violation because neither the short video nor the associated still image constituted exculpatory evidence and Dayvault did not object to the admission of the still photo from the video. Here, Dayvault only argues the evidence was exculpatory. He does not assert it was favorable to him as impeachment evidence. A point not raised is deemed waived or abandoned. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021).

Dayvault makes a speculative argument that "[t]he video and still image . . . [were] exculpatory in the context of other trial evidence." Specifically, he asserts the timestamp in the short video showed his Dodge Intrepid driving near H.H.'s house "a full hour" before the sexual assault. He argues this evidence supports an inference it was the driver of the white Buick who sexually assaulted H.H. Dayvault's argument is unpersuasive because the video of the white Buick was not admitted at trial, and Dayvault concedes the long video contains no time stamp; thus, it cannot be established when the white Buick was in the area. Contrary to Dayvault's argument, the fact Dayvault's car was recorded in the area an hour before H.H. was sexually assaulted does not "[support] an argument that H.H. was assaulted by someone other than [him]." At best, the fact is neutral because Dayvault lived near the area. Thus, it would not be particularly surprising to see Dayvault's vehicle in security footage taken at any number of other times. But given the additional evidence presented of Dayvault's other sex crimes committed against a child in 2017, when he was also driving his white Dodge Intrepid, the evidence seems almost entirely inculpatory.

Because the evidence is not exculpatory and Dayvault waived any argument the evidence was favorable for impeachment purposes, we find his claim fails at the first element of the *Brady* analysis. See *Warrior*, 294 Kan. at 506. But even if the evidence were exculpatory, Dayvault's claim would still fail. For the sake of brevity, we will simply assume Dayvault can establish the prosecution suppressed the evidence—the second element of a *Brady* violation. However, if we were to reach the third element of

13

Dayvault's *Brady* claim, he cannot establish the evidence was material because there is no reasonable probability the outcome of trial would have been different if the evidence was disclosed earlier.

As the district court noted, Dayvault never asked for a continuance to review the short video. Moreover, neither video was admitted at trial. The district court further noted DNA evidence was a significant basis for the State's case; Dayvault admittedly owned a white four-door Dodge Intrepid at the time H.H. was sexually assaulted; Dayvault lived nearby; and propensity evidence demonstrated Dayvault was sexually attracted to children. In light of this evidence, a video of Dayvault's car—the same car he later used in committing another sex crime against a different child—in the area an hour before the sexual assault on H.H. would not have caused the jury to doubt his guilt. Accordingly, even if the evidence was favorable, Dayvault cannot show prejudice from the State's late disclosure.

*The Prosecutor's Opening Statement Referencing a Video Not Admitted into Evidence Does Not Constitute Reversible Prosecutorial Error*

Dayvault argues the State committed prosecutorial error in its opening statement when it told the jury it would see surveillance video showing a white vehicle in the area around the time of the incident.

*Standard of Review*

We use a two-step process to evaluate claims of prosecutorial error:  error and prejudice.

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded

14

prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

*Discussion*

Relevant to Dayvault's argument, in her opening statement the prosecutor told the jury:

"Officer Charles Byers assisted in the crime scene investigation. He made multiple attempts to try and find video footage, or surveillance footage, that would show the area that [H.H.] was in at the time of the incident. He was able to find a video from Central Steel Company. And you will see a map of where all of these things are in relation to one another.

"You will also see the video of the surveillance that they were able to pull from Central Steel Company, and you will notice a white car pull into the area of [H.H.'s] home; and you will see it, after several minutes, drive away. Detective Aaron Howard used those leads, in an email that was sent from Detective Wertz, about two possible vehicles of interest: A Buick and a white Dodge Intrepid.

"Detective Howard noticed, in the surveillance picture, that there was a small, white sticker in the rear, lower driver's-side corner of the white Dodge Intrepid. And he was able to run that through a series of databases, that you will hear about, and a license plate reader. That attached back to James Dayvault. And you will hear about an email, that was sent to Detective Wertz in 2015, that was not followed up on at that time."

15

Dayvault admits the prosecutor did not specifically claim it was his Dodge Intrepid in the video, but he asserts this was heavily implied. Dayvault acknowledges "the prosecution appears to have been honestly confused about what its evidence showed when it gave its opening statement." But Dayvault asserts the prosecution failed to properly determine what the evidence actually reflected and, therefore, misrepresented the expected evidence in its opening statement; thus, the statements were erroneous.

The purpose of opening statements is to assist the jury with its understanding of what each side expects the evidence at trial will prove, as well as to advise the jury of the questions it will be asked to decide. A prosecutor is afforded reasonable latitude in telling the jury the facts the State intends to prove through its evidence at trial. *State v. McCorkendale*, 267 Kan. 263, 277, 979 P.2d 1239 (1999), *overruled on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 (2009).

Dayvault advances, at best, a speculative argument, asserting: "Had the prosecution asked for an informed opinion on the make and model of the car shown in their video evidence prior to trial, it could have avoided making the mistake that it did." This argument ignores the fact Byers reviewed the video with the prosecutor the week before trial and never advised the State the vehicle depicted in the video was a Buick, not a Dodge. Given Dayvault's limited and largely conclusory arguments, which lack any citation to supporting authority, we find the prosecutor's comments were not erroneous.

However, even if the comments were erroneous, they were harmless beyond a reasonable doubt. Dayvault fails to acknowledge the extensive clarification of the issue put on record after the prosecutor realized Byers' confusion about what he observed in the security videos. The district court instructed the jury it must decide the case based on the evidence presented and it must disregard any arguments not supported by the evidence. Again, we presume the jury followed the district court's instructions. *Corey*, 304 Kan. at 734. In light of this instruction, it is difficult to see how the State referring to a video it

16

never presented to the jury could have affected the verdict. To the contrary, the State is correct this was, in fact, harmful to its case. Dayvault was able to question the officers about the surveillance videos and used the lack of video to his benefit in closing argument. Given these facts, as well as the overwhelming nature of the evidence as further discussed, any error was harmless beyond a reasonable doubt.

*No Limiting Instruction Was Required Regarding the Jury's Consideration of Dayvault's Prior Acts of Sexual Misconduct*

Dayvault next argues—for the first time on appeal—the district court erred in not giving the jury a limiting instruction on how it could consider the evidence of Dayvault's prior acts of sexual misconduct admitted under K.S.A. 2022 Supp. 60-455(d). Dayvault acknowledges he did not request the jury instruction; therefore, we review the issue for clear error. *State v. Smith*, 317 Kan. 130, 136, 526 P.3d 1047 (2023).

We must first consider whether a limiting instruction would have been legally and factually appropriate, applying an unlimited standard of review and considering the entire record. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021). In determining whether a limiting instruction would have been factually appropriate, we must determine whether there was sufficient evidence, viewed in the light most favorable to Dayvault, that would have supported the instruction. See 313 Kan. at 255. If Dayvault shows the instruction would have been legally and factually inappropriate, he must then firmly convince us the jury would have reached a different verdict if the instruction had been given. As the party claiming clear error, Dayvault has the burden to show both error and prejudice. See *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

Prior to trial, the State moved to admit evidence pursuant to K.S.A. 2022 Supp. 60-455(d) that Dayvault was convicted following a bench trial in another case of sexual exploitation of a child, lewd and lascivious behavior, breach of privacy, and attempted

17

breach of privacy. These convictions included findings the breach of privacy charge and attempted breach of privacy were sexually motivated crimes. The district court granted the State's motion in part, finding Dayvault's prior convictions for sexual exploitation of a child and lewd and lascivious behavior were admissible.

It does not appear the jury was ever specifically informed about Dayvault's prior convictions. The State indicated it intended to call former Sedgwick County Sheriff's Deputy Shea Carpenter to testify about Dayvault's 2017 conviction for lewd and lascivious behavior because Dayvault did not want to stipulate to the conviction. Carpenter testified she was involved in the investigation of the suspicious character call in 2017 where Dayvault admitted to following and attempting to photograph a young girl. Carpenter explained, as part of her investigation, officers recovered a video depicting Dayvault holding his exposed penis; however, there was no testimony from Carpenter reflecting Dayvault was charged with or convicted of any crime as a result. Leffew similarly testified about his involvement in the 2017 investigation, and, like Carpenter, Leffew never testified Dayvault was charged with or convicted of any crime in relation to that investigation.

Interestingly, Dayvault's briefing does not address the specific evidence presented to the jury at trial. Without clearly explaining the nature and extent of the evidence presented, it seems a stretch to argue it was clearly erroneous for the district court not to give a limiting instruction for that particular evidence. Thus, we find Dayvault has failed to properly brief the issue. See *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021) (issues not adequately briefed deemed abandoned).

However, if we were to address the merits, the failure to give the instruction was not clearly erroneous. In the interest of brevity, we will assume without deciding that had the point been properly briefed, a limiting instruction would have been legally and factually appropriate. Even so, the failure to give the instruction was not clearly

18

erroneous. Here, the evidence against Dayvault was overwhelming. DNA from Dayvault was found around H.H.'s mouth. H.H. testified her attacker covered her mouth with his hand during the sexual assault. H.H.'s description of her attacker and his vehicle matched Dayvault and his car. Dayvault admitted he drove a white Dodge Intrepid around the time of the incident, and there was a photo of Dayvault's vehicle near the area on the day the sexual assault occurred. Dayvault cannot meet his burden to firmly convince us the jury's verdict would have been different if the district court had given a limiting instruction.

*Cumulative Error Does Not Entitle Dayvault to a New Trial*

Dayvault argues that even if none of the errors asserted in his first four issues are individually reversible, their cumulative effect deprived him of his right to a fair trial.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, we examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional in nature, the party benefitting from the error "'must establish beyond a reasonable doubt that the cumulative effect . . . did not affect the outcome.'" *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

We are convinced Dayvault has established no error in his first three claims. Further, based on our Supreme Court's recent decision in *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024) (holding unpreserved instructional errors not to be considered under cumulative error analysis), we cannot consider Dayvault's fourth claim—failure to give a limiting instruction—in our cumulative error analysis because it was not raised below and he has not established clear error. Moreover, due to the

overwhelming nature of the State's evidence, "[n]o prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming." *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

*The District Court Imposed an Illegal Sentence*

The State largely agrees with Dayvault that the district court erred in imposing a determinate grid-based sentence. Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which we have unlimited review. *State v. Mitchell*, 315 Kan. 156, 158, 505 P.3d 739 (2022).

Here, Dayvault was convicted in 2022 of aggravated indecent liberties with a child for a crime committed in 2015 and he was 18 years or older at the time of the offense. Thus, he should have been sentenced to lifetime imprisonment without the possibility of parole for 25 years (hard 25). See K.S.A. 2015 Supp. 21-5506(c)(3) (severity level of crime); K.S.A. 2015 Supp. 21-6627(a)(1)(C) (sentencing). Dayvault's criminal history included a prior conviction for sexual exploitation of a child under the age of 18. However, it appears the district court applied the special sentencing rule set forth in K.S.A. 2015 Supp. 21-6627(b)(2)(B) and not what was set out in K.S.A. 2015 Supp. 21-6627(a)(1)(C). In doing so, the district court was mistaken when it believed it had to impose a determinate grid sentence and ordered Dayvault to serve 653 months' imprisonment. Instead, K.S.A. 2015 Supp. 21-6627(a)(1)(C) applies, and the district court erred when it imposed a determinate grid-based sentence, not a term of lifetime imprisonment *with a mandatory minimum term* of 25 years as required by K.S.A. 2015 Supp. 21-6627(a)(1)(C).

Given Dayvault's criminal history, neither special sentencing rule—K.S.A. 2015 Supp. 21-6627(a)(2)(B) nor (b)(2)(B)—applies because his sentencing range on the nondrug grid is 221 to 247 months of imprisonment. K.S.A. 2015 Supp. 21-6804(a).

It is well-established that the penalty for an offense is fixed as of the date the offense was committed. See e.g., *State v. Overton*, 279 Kan. 547, 561, 112 P.3d 244 (2005). Here, Dayvault's crime of conviction was committed on or about November 15, 2015; thus, the language of K.S.A. 2015 Supp. 21-6627(a)(2)(B)—not subsequent codifications—controls. For purposes of the 2015 sentencing range, a grid sentence for aggravated indecent liberties with a child would be based on a severity level 3 nondrug crime. K.S.A. 2015 Supp. 21-5506(a)(3)(A) and (c)(2)(C). Thus, the applicable sentencing range pursuant to the nondrug sentencing grid with criminal history A would be 221 to 247 months' imprisonment. K.S.A. 2015 Supp. 21-6804(a). Therefore, the special sentencing rule of K.S.A. 2015 Supp. 21-6627(a)(2)(B) does not apply because a grid sentence would not result in more than 300 months' imprisonment. Accordingly, we vacate Dayvault's sentence and remand for resentencing.

Dayvault asserts he should be allowed to reargue his departure motion at resentencing. In response, the State claims—without any citation to authority—that because the departure motion was already denied and Dayvault has not appealed the denial of his departure motion, he should not be allowed to reargue the issue on remand. The State is incorrect.

In *State v. Guder*, 293 Kan. 763, 766, 267 P.3d 751 (2012), our Supreme Court held a district court has limited jurisdiction on remand for resentencing to modify sentences "to correct arithmetic or clerical errors, *to consider or reconsider departures from presumptive sentences*, or to modify sentences by reinstating previously revoked probations." (Emphasis added.) In *State v. McMillan*, No. 124,726, 2023 WL 176653, at *5 (Kan. App.) (unpublished opinion), *rev. granted* 317 Kan. 848 (2023), another panel of this court concluded our Supreme Court's precedent and the plain language of the revised Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-6801 et seq., gives the district court authority to reconsider a departure motion on remand for resentencing.

21

At resentencing, a district court must impose a sentence compliant with the KSGA. *State v. Jamerson*, 309 Kan. 211, 216, 433 P.3d 698 (2019). "In doing so, the court has to exercise its independent judgment—within the limitations imposed by the KSGA—to determine the appropriate sentence." 309 Kan. at 218. Because this exercise of the district court's independent judgment under the KSGA includes whether to grant or deny a departure motion, the district court may consider such a motion if Dayvault moves for a departure sentence on remand. Otherwise, Dayvault is subject to be sentenced under K.S.A. 2015 Supp. 21-6627(a)(1).

*The District Court Erred in Imposing Multiple Lab Fees for a Single Conviction*

The State agrees with Dayvault the district court erred in ordering Dayvault to pay three separate KBI lab fees of $400 each. This issue requires us to interpret K.S.A. 28-176—a question of law subject to unlimited review. *State v. Stoll*, 312 Kan. 726, 736, 480 P.3d 158 (2021). K.S.A. 28-176(a) requires the sentencing court to order a defendant "to pay a separate court cost of $400 *for every individual offense* if forensic science or laboratory services, forensic computer examination services or forensic audio and video examination services are provided, in connection with the investigation." (Emphasis added.) Here, Dayvault was only convicted of one offense; thus, he can only be ordered to pay one $400 lab fee. We vacate the district court's imposition of lab fees set forth in the journal entry of sentencing and instruct the district court to order the appropriate lab fee on remand for resentencing.

Conviction affirmed, sentence and cost assessment vacated, and case remanded with directions.

22